CITRIN HOLDINGS, LLC, Jacob Citrin, Cargo Investors LLC, and Cargo Investors II LLC, Appellants,

v.

Matthew MINNIS and Cullen 130, LLC, Appellees.

No. 14–09–00186–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Dec. 8, 2009.

---

Paul D. Clote, Larry R. Veselka, Kristen Lee Mckeever, Christina A. Bryan, Houston, for Appellants.

Brandon Trent Allen, Jean C. Frizzell, Jennifer Horan Greer, John Scott Black, Houston, for Appellees.

Panel consists of Justices ANDERSON and BOYCE.

## OPINION

WILLIAM J. BOYCE, Justice.

Appellants Jacob Citrin, Citrin Holdings LLC, Cargo Investors LLC, and Cargo Investors II LLC challenge the trial court's order denying their special appearances. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(7) (Vernon 2008). We affirm.

### Background

#### I. Parties

This case involves claims for fraud, fraudulent inducement, breach of contract, breach of fiduciary duty, and negligent misrepresentation arising from business relationships among two individuals and various entities they created to engage in real estate transactions. There are two plaintiffs:

- **Matthew Minnis,** a Texas resident.
- **Cullen 130 LLC,** a limited liability company formed under Delaware law. *See* Del.Code Ann. tit. 6, §§ 18–201–18–216 (2009). Cullen 130 was formed in October 2004 as a holding company for Minnis, who is the sole member of Cullen 130.

Minnis and Cullen 130 sued five defendants:

- **Jacob Citrin,** a New York resident.
- **Citrin Holdings LLC,** a limited liability company formed under Delaware law. *See id.* Citrin Holdings was formed on October 6, 2004 as a holding company for Citrin, who is the sole member of Citrin Holdings.
- **Cargo Ventures LLC,** a limited liability company formed under New York law. *See* N.Y. Ltd. Liab. Co. §§ 201–214 (McKinney 2009). Citrin originally created Cargo Ventures in December 2003 and served as its only member until Citrin and Minnis executed the Cargo Ventures Operating Agreement in October 2004. After executing the operating agreement, Citrin ceased to be a member of Cargo Ventures. From October 2004 onward, Citrin Holdings owned 55 percent of Cargo Ventures and Cullen 130 owned 45 percent. Citrin and Minnis both signed the operating agreement individually. Citrin is the "manager" of Cargo Ventures.
- **Cargo Investors LLC,** a limited liability company formed under Delaware law. *See* Del.Code Ann. tit. 6, §§ 18–201–18–216. Cargo Investors was formed in March 2005. Cargo Investors holds equity interests in real estate investments in the freight and warehousing markets. Citrin Holdings owns 55 percent of Cargo Investors and Cullen 130 owns 45 percent. Citrin is the "manager" of Cargo Investors.
- **Cargo Investors II LLC,** a limited liability company formed under Delaware law. *Id.* Cargo Investors II was formed in January 2006. Cargo Investors II holds equity interests in real estate investments in the freight and warehousing markets. Citrin Holdings owns 80 percent of Cargo Investors II and Cullen 130 owns 20 percent. Citrin is the "manager" of Cargo Investors II.

## II. Facts

Matthew Minnis and Jacob Citrin met while Citrin worked for a company that developed and leased warehouse space at airports. Minnis was a broker for a tenant who leased warehouse and office space from Citrin's company in 2003.

Citrin traveled to Houston, Texas to meet with Minnis in mid–2003. Citrin states in an affidavit that the trip's purpose was to celebrate signing the lease. Minnis states in his affidavit that he and Citrin began discussions during this trip focused on starting a business together to purchase, develop, and manage real estate. Citrin states that "it is possible that Mr. Minnis and I generally and vaguely discussed the possibility of doing further business together" during the 2003 Houston visit, "but I did not consider those discussions to be serious . . . . "

Citrin and Minnis continued their dialogue into 2004 through telephone calls and e-mails, and during face-to-face discussions in Houston. Citrin traveled to Houston again in mid–2004 to meet with Minnis. During this meeting in Houston, Citrin wrote on a piece of paper the following: "We are partners. 55% Jake, 45% Matt." Citrin and Minnis both signed this document. Although no copies of this document were made and the original has disappeared, Citrin and Minnis confirmed the writing's existence in their affidavits and depositions. Minnis asserts the "we are partners" document created a partnership agreement. Citrin contends this document is not an enforceable contract.

According to Minnis, Citrin made misrepresentations to induce him to sign the "we are partners" document. Minnis al-

leges that Citrin promised they would be partners; that the two partners would build a real estate portfolio together; and that Citrin always would act in Minnis's best interest. Minnis alleges that Citrin made these promises in telephone calls, faxes, and e-mails directed to Minnis in Texas, and in person while Minnis and Citrin met in Houston.

In October 2004, the prolonged discussions between Citrin and Minnis culminated in a signed contract called the Cargo Ventures Operating Agreement. Citrin Holdings and Cullen 130 became the sole members of Cargo Ventures. Citrin and Minnis signed the contract in their individual capacities as well as their representative capacities on behalf of Citrin Holdings and Cullen 130. Citrin and Minnis subsequently signed contracts creating Cargo Investors and Cargo Investors II to hold equity interests in real estate investments in the freight and warehousing markets. Citrin, on behalf of Citrin Holdings, and Minnis, on behalf of Cullen 130, signed the Cargo Investors Operating Agreement in March 2005; they signed the Cargo Investors II Operating Agreement in January 2006.

All three operating agreements obligated Citrin (in his capacity as "manager") and Minnis (in his capacity as "the controlling owner of Cullen 130") to "devote such time, attention, and effort to the Company as is reasonably necessary for the management of the Company and the conduct of its business." Minnis and Cullen 130 maintained offices in Houston and operated out of Houston at all relevant times before and after execution of the Cargo Ventures Operating Agreement in October 2004. The operating agreement's signature pages listed Houston addresses for Minnis and Cullen 130. According to Minnis's affidavit, "My company, Cullen 130, is based solely in Houston, Texas. Since its

inception, its only place of business has been Houston, Texas."

In furtherance of the operating agreements related to Cargo Ventures, Cargo Investors, and Cargo Investors II, Minnis asserts in his affidavit that he "actively pursued and developed potential projects, assisted in bringing potential projects to closing, and participated in the ongoing management and direction of consummated projects, and fulfilled my management and decision-making responsibilities for the Cargo Entities based out of Texas." Minnis further states, "From 2004 until late 2006, I conducted business on behalf of, and provided services to, the three Cargo Entities on a day-to-day basis from my office in Houston, Texas." Citrin and Citrin Holdings operated out of New York and communicated with Minnis and Cullen 130 in Houston by telephone, fax, e-mail, and mail.

Cargo Ventures and Cargo Investors entered several transactions with Millennium Partners during 2004 and 2005. Millennium Partners is partly owned by Citrin's father-in-law. In 2005, another entity approached Cargo Ventures and Cargo Investors with an offer to participate in future transactions on terms more favorable than those provided by Millennium Partners. Citrin and Citrin Holdings wanted to continue transacting with Millennium Partners but needed Minnis's consent on behalf of Cullen 130 to do so. Negotiations continued for several months and ended with Minnis consenting on Cullen 130's behalf to transactions with Millennium Partners.

Minnis and Cullen 130 allege that Citrin made a series of misrepresentations to induce them to consent to transactions with Millennium Partners. Minnis and Cullen 130 allege that Citrin and Citrin Holdings promised to (1) grant Cargo Ventures, Cargo Investors, and Cargo Investors II

greater profit interests in future transactions; and (2) restructure certain existing partnerships and business relationships to compensate Cargo Ventures, Cargo Investors, and Cargo Investors II for entering into less favorable agreements with Millennium Partners. Minnis and Cullen 130 assert that these misrepresentations were made in telephone calls from Citrin to Minnis and Cullen 130 in Texas.

Citrin, acting through Citrin Holdings, began proceedings to dissolve Cargo Ventures, Cargo Investors, and Cargo Investors II in late 2006. Minnis and Cullen 130 received notice in a fax sent to Houston that Citrin Holdings had dissolved the three entities. Minnis and Cullen 130 subsequently filed this suit against Citrin, Citrin Holdings, Cargo Ventures, Cargo Investors, and Cargo Investors II on December 13, 2006 alleging six causes of action: (1) fraud involving alleged misrepresentations relating to the "we are partners" document and the Millennium Partners transactions; (2) breach of contract relating to the "we are partners" document and the Cargo Ventures Operating Agreement; (3) breach of fiduciary duty and good faith; (4) negligent misrepresentation; (5) an action for an accounting; and (6) an action for majority oppression.

Defendants Citrin, Citrin Holdings, Cargo Investors, and Cargo Investors II challenged the existence of personal jurisdiction in Texas by filing special appearances under Texas Rule of Civil Procedure 120a. The trial court denied the special appearances in an order signed on February 5, 2009. Defendant Cargo Ventures did not file a special appearance. Citrin, Citrin Holdings, Cargo Investors, and Cargo Investors II timely filed a notice of appeal on February 25, 2009. See Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(7) (Vernon 2008). Appellants timely filed a request for findings of fact and conclusions of law under Texas Rule of Civil Procedure 296; none were filed.

### Standard of Review

■ Determining whether a trial court has personal jurisdiction over a defendant presents a question of law subject to *de novo* review. *BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002).

Trial courts frequently must resolve fact questions before deciding the jurisdictional question. *Id.* If the trial court does not sign findings of fact and conclusions of law, all facts necessary to support the trial court's ruling and supported by the evidence are implied in favor of the trial court's decision. *Id.* at 794–95. When the appellate record includes the reporter's record and the clerk's record, parties may challenge the legal and factual sufficiency of these implied findings. *Id.* If the appellate court determines that the trial court's findings are supported by sufficient evidence, or if the material facts are undisputed, then the appellate court decides as a matter of law whether those facts negate all bases for personal jurisdiction. *Id.*

■ The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident within the provisions of the Texas long-arm statute. *Id.; Cerbone v. Farb,* 225 S.W.3d 764, 766–67 (Tex. App.-Houston [14th Dist.] 2007, no pet.). The burden then shifts to the nonresident defendant to negate all bases of personal jurisdiction asserted by the plaintiff. *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex.2007); *Cerbone,* 225 S.W.3d at 767.

■ The court will not resolve any merits-based questions on appeal regarding a special appearance. *Pulmosan Safety Equip. Corp. v. Lamb,* 273 S.W.3d 829, 839

(Tex.App.-Houston [14th Dist.] 2008, pet. denied).

### Governing Law

■ Texas courts may not exercise personal jurisdiction over a nonresident defendant unless federal due process requirements and the Texas long-arm statute are satisfied. *See* Tex. Civ. Prac. & Rem.Code Ann. § 17.042(1) (Vernon 2008); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 412–13, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). The Texas long-arm statute authorizes personal jurisdiction over a nonresident defendant who "does business" in Texas.[1] Tex. Civ. Prac. & Rem.Code Ann. § 17.042; *see also Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex.1990) ("Our long arm statute authorizes the exercise of jurisdiction over those who do business in Texas."). The long-arm statute is limited by federal due process requirements; the broad language of section 17.042's "does business" requirement reaches to the full extent authorized by federal due process requirements. *See Moki Mac*, 221 S.W.3d at 575; *Marchand*, 83 S.W.3d at 795; *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex.1991). Thus, the statute's requirements are satisfied if the exercise of personal jurisdiction comports with federal due process requirements. *See Guardian Royal*, 815 S.W.2d at 226.

■ Federal due process requirements are satisfied if (1) the nonresident defendant has "minimum contacts" with

Texas; and (2) the exercise of personal jurisdiction over the nonresident defendant does not offend "traditional notions of fair play and substantial justice." *See Helicopteros*, 466 U.S. at 412–13, 104 S.Ct. 1868; *Moki Mac*, 221 S.W.3d at 575. Minimum contacts are sufficient when a nonresident defendant " 'purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.' " *Moki Mac*, 221 S.W.3d at 575 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

### I. Minimum Contacts

To determine whether a nonresident defendant has sufficient minimum contacts with Texas to support the exercise of personal jurisdiction, the court must determine whether the nonresident defendant "purposefully availed" itself of the privilege of conducting business in Texas. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). Purposeful availment is the "touchstone of jurisdictional due process." *Michiana Easy Livin' Country*, 168 S.W.3d at 784.

■ Three key principles govern analysis of purposeful availment. *Id.* at 785. First, the court considers the defendant's own actions; it does not consider the unilateral activity of another party. *Id.* Second, the court considers whether

---

1. The Texas long-arm statute provides as follows:

 In addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident:
 (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;

 (2) commits a tort in whole or in part in this state; or
 (3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.
 Tex. Civ. Prac. & Rem.Code Ann. § 17.042(1)-(3).

the defendant's actions were purposeful rather than "random, isolated, or fortuitous." *Id.* Third, the defendant must seek "some benefit, advantage, or profit by availing itself" of the privilege of doing business in Texas. *Id.* A defendant may purposefully avoid Texas by structuring its transactions to neither profit from Texas's laws nor subject itself to personal jurisdiction. *Burger King,* 471 U.S. at 472, 105 S.Ct. 2174; *Moki Mac,* 221 S.W.3d at 575. The defendant's contacts must be considered as a whole and not in isolation, focusing on the nature and quality of the contacts. *Guardian Royal,* 815 S.W.2d at 230 n. 11. When there are multiple defendants, the contacts of each defendant must be analyzed individually. *See Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); *Shapolsky v. Brewton,* 56 S.W.3d 120, 135 (Tex.App.-Houston [14th Dist.] 2001, pet. denied), *disapproved of on other grounds by Michiana Easy Livin' Country,* 168 S.W.3d at 788–89.

Minimum contacts analysis is further analyzed in terms of (1) specific jurisdiction; and (2) general jurisdiction.

When specific jurisdiction is asserted, the court focuses on the relationship between the defendant, the forum, and the litigation. *Helicopteros,* 466 U.S. at 414, 104 S.Ct. 1868; *Moki Mac,* 221 S.W.3d at 575–76. The cause of action must "arise from or relate to" the nonresident defendant's contacts with the forum. *Guardian Royal,* 815 S.W.2d at 228. Specific jurisdiction over a nonresident defendant is established if (1) the defendant's activities were purposefully directed to the forum state; and (2) there is a substantial connection between the defendant's forum contacts and the operative facts of the litigation. *Moki Mac,* 221 S.W.3d at 585.

An assertion of general jurisdiction compels a more demanding minimum contacts analysis and requires a showing of substantial activities within the forum. *See Guardian Royal,* 815 S.W.2d at 228. The cause of action need not "arise from or relate to" the nonresident defendant's contacts with the forum. *See id.* Rather, general jurisdiction is "dispute blind" and requires contacts of a continuous and systematic nature. *See Helicopteros,* 466 U.S. at 414–16, 104 S.Ct. 1868; *Guardian Royal,* 815 S.W.2d at 228. Thus, it is more difficult to establish general jurisdiction. *See Helicopteros,* 466 U.S. at 414–16, 104 S.Ct. 1868; *Guardian Royal,* 815 S.W.2d at 228. To determine whether a nonresident defendant had continuous and systematic contacts with Texas sufficient to support general jurisdiction, the court examines the defendant's contacts and forum-related activities up to the time suit was filed. *PHC–Minden, L.P. v. Kimberly–Clark Corp.,* 235 S.W.3d 163, 170 (Tex.2007).

The defendant must negate all bases for personal jurisdiction to prevail in a special appearance. *See Shapolsky,* 56 S.W.3d at 135. A single basis for personal jurisdiction is sufficient to confer jurisdiction over a defendant. *See id.* The court need not address general jurisdiction if it finds that a defendant is subject to specific jurisdiction. *See id.* If the court finds specific jurisdiction over a defendant based on one cause of action, the court need not address jurisdiction as to any other causes of action. *See id.*

## II. Fair Play and Substantial Justice

Once the court concludes that the defendant has sufficient minimum contacts with the state to establish personal jurisdiction, the defendant bears the burden of establishing that the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice. *Conner v. ContiCarriers & Terminals,*

*Inc.,* 944 S.W.2d 405, 411 (Tex.App.-Houston [14th Dist.] 1997, no writ).

 To determine whether the exercise of personal jurisdiction offends traditional notions of fair play and substantial justice, the court considers (1) the burden on the defendant; (2) the interests in the forum state in adjudicating the dispute; (3) the plaintiff's interests in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the states in furthering fundamental substantive social policies. *Burger King,* 471 U.S. at 476–77, 105 S.Ct. 2174; *Guardian Royal,* 815 S.W.2d at 228. Only in rare cases will the exercise of personal jurisdiction not comport with fair play and substantial justice when a nonresident defendant has purposefully availed itself of the privilege of conducting business within a forum. *Guardian Royal,* 815 S.W.2d at 231.

### Analysis

Appellants Citrin, Citrin Holdings, Cargo Investors, and Cargo Investors II contend the trial court erred in denying their respective special appearances. We address each appellant in turn.

### I. Jacob Citrin

Minnis and Cullen 130 assert that personal jurisdiction over Citrin is established because they effected personal service on him, and because the minimum contacts standard is satisfied. Minnis and Cullen 130 contend Citrin is subject to specific jurisdiction based on (1) the existence of long-term contractual relationships with Minnis and Cullen 130; and (2) misrepresentations Citrin allegedly made to Minnis and Cullen 130. Minnis and Cullen 130 do not contend that Citrin is subject to general jurisdiction in Texas.

#### A. Personal Service

 Citrin filed his special appearance on April 13, 2007. On January 16, 2009, the trial court signed an order compelling Citrin to appear for deposition by January 23, 2009. The trial court limited the scope of the deposition to "any pending or potential transactions, and any efforts associated therewith, by any Defendant or affiliated person or entity, that would in any way affect, transfer, diminish, or dilute the assets made subject to Plaintiffs' claims."

Minnis and Cullen 130 effected personal service on Citrin after his deposition was concluded on January 23, 2009. Relying on *Oates v. Blackburn,* 430 S.W.2d 400, 402–03 (Tex.App.-Houston [14th Dist.] 1968, writ ref'd n.r.e.), they contend that personal service of process on Citrin in Texas is sufficient to establish personal jurisdiction in Texas.

 We reject Minnis's and Cullen 130's contention in light of the parties' course of conduct. It is undisputed that Citrin, Citrin Holdings, Cargo Investors, and Cargo Investors II timely filed special appearances. "The issuance of process for witnesses, the taking of depositions, the serving of requests for admissions, and the use of discovery processes, shall not constitute a waiver of such special appearance." Tex.R. Civ. P. 120a. "Every appearance, prior to judgment, not in compliance with this rule is a general appearance." *Id.* The "privilege against process is effective for a defendant who enters the state solely to contest jurisdiction under Rule 120a on any matter connected with the contested action." *Oates,* 430 S.W.2d at 403. Consistent with Rule 120a, counsel for Minnis and Cullen 130 stated during a January 13, 2009 hearing that "[w]e've been operating under the impression and with the agreement that depositions are subject to the special appearance. . . ."

In light of the parties' agreement—acknowledged on the record by counsel for Minnis and Cullen 130—we conclude that Citrin is not subject to personal jurisdiction in this matter based on personal service effected upon him following his deposition.[2]

## B. Minimum Contacts

 We next consider whether Citrin purposefully availed himself of the privilege of doing business in Texas. The circumstances relating to Citrin individually involve analysis of contacts relating to contract and tort claims.

 Standing alone, entering a contract with a Texas resident does not necessarily establish minimum contacts sufficient to support personal jurisdiction. *Burger King*, 471 U.S. at 478–79, 105 S.Ct. 2174; *Nogle & Black Aviation, Inc. v. Faveretto*, 290 S.W.3d 277, 283 (Tex.App.-Houston [14th Dist.] 2009, no pet.); *Ashdon, Inc. v. Gary Brown & Assocs.*, 260 S.W.3d 101, 113 (Tex.App.-Houston [1st Dist.] 2008, no pet.); *Olympia Capital Assocs., L.P. v. Jackson*, 247 S.W.3d 399, 417 (Tex.App.-Dallas 2008, no pet.). But a single contract may establish sufficient minimum contacts when considered against a backdrop of "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing[.]" *Burger King*, 471 U.S. at 478–79, 105 S.Ct. 2174; *see also Fish v. Tandy Corp.*, 948 S.W.2d 886, 890 (Tex.App.-Fort Worth 1997, pet. denied) (nonresident defendant established purposeful availment by negotiating with Texas corporation through personal visits

to Texas and through telephone, mail, and faxes to and from Texas).

 The contract's place of performance is an important consideration. *See Barnstone v. Congregation Am Echad*, 574 F.2d 286, 288–89 (5th Cir.1978); *Fleischer v. Coffey*, 270 S.W.3d 334, 338 (Tex.App.-Dallas 2008, no pet.). The Texas long-arm statute specifically references place of performance. *See* Tex. Civ. Prac. & Rem. Code Ann. § 17.042(1) ("[A] nonresident defendant does business in this state if the nonresident ... contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state."). Generally, a party is not subject to jurisdiction in Texas if a contract calls for performance out of state. *See Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 807–08 (Tex.2002); *Ashdon, Inc.*, 260 S.W.3d at 113; *Jackson*, 247 S.W.3d at 417–18. A contract calling for performance in Texas can support personal jurisdiction in appropriate circumstances. *See Fleischer*, 270 S.W.3d at 338; *Nogle & Black Aviation, Inc.*, 290 S.W.3d at 283. It is reasonable to subject a nonresident defendant to personal jurisdiction in Texas in connection with litigation arising from a contract specifically designed to benefit from the skills of a Texas resident who performs contractual obligations in Texas. *See Nogle & Black Aviation, Inc.*, 290 S.W.3d at 283.

 As noted above, Minnis and Cullen 130 also have asserted tort claims. They contend that a defendant subjects himself to personal jurisdiction in Texas by directing a tort toward Texas. The Texas

---

**2.** Minnis and Cullen 130 contend that personal service on Citrin also established personal jurisdiction as to Citrin Holdings, Cargo Investors, and Cargo Investors II because Citrin was the sole owner of Citrin Holdings and the "manager" of the latter two entities. Given our holding that personal service upon Citrin

in Texas did not establish personal jurisdiction in light of the parties' agreement, we do not address whether personal service effected upon Citrin would have been sufficient to establish personal jurisdiction in Texas as to these separate entities.

Supreme Court addressed this approach to personal jurisdiction in *Michiana Easy Livin' Country*, 168 S.W.3d at 790–92. *Michiana Easy Livin' Country* teaches that courts should focus their jurisdictional analysis on the defendant's actual contacts rather than attempting to discern whether a given set of circumstances amounts to "directing" a tort towards Texas. *See id.* at 791. Because minimum contacts analysis addresses the actions and reasonable expectations of the nonresident defendant, this court will weigh Citrin's alleged conduct in terms of its significance as evidence of contacts between Citrin and Texas. *See id.*

 Specific jurisdiction is not necessarily established by evidence that a nonresident defendant made misrepresentations in a single telephone call to a Texas resident. *Id.* at 791–92. But fraudulent misrepresentations made over a series of contacts to induce a party to enter a transaction can support personal jurisdiction. *See Glencoe Capital Partners II, L.P. v. Gernsbacher*, 269 S.W.3d 157, 164–67 (Tex. App.-Fort Worth 2008, no pet.) (defendants were subject to personal jurisdiction in Texas based on misrepresentations during numerous telephonic board meetings over multiple years that induced Texas-based board members, who called into the meetings from Texas using a toll-free number, to enter certain transactions).

 Citrin contends that he did not purposefully avail himself of the privilege of doing business in Texas because the Cargo Ventures Operating Agreement contained a choice of law clause selecting New York law. A choice of law clause selecting the laws of a different forum weighs against finding a defendant subject to personal jurisdiction in Texas. *See Michiana Easy Livin' Country*, 168 S.W.3d at 792. Choice of law clauses "should not be ignored in considering whether a defendant

has 'purposefully invoked the benefits and protections of a State's laws.'" *Id.* (quoting *Burger King*, 471 U.S. at 482, 105 S.Ct. 2174). But neither are they dispositive. *See Electrosource, Inc. v. Horizon Battery Techs., Ltd.*, 176 F.3d 867, 873 (5th Cir. 1999). A choice of law clause is merely one factor to consider in determining whether a forum state has personal jurisdiction over a nonresident defendant. *Id.* The "we are partners" document did not contain a choice of law clause.

Citrin states in his affidavit that "[s]ince December 3, 2003, I have traveled to Texas approximately seven or eight times as a representative of Cargo Ventures, and during three or four of those trips, I visited the offices of Matthew Minnis ... the sole member of Delaware limited liability company Cullen 130, LLC...." Citrin nonetheless argues that he structured his contractual relationship with Minnis to avoid subjecting himself to personal jurisdiction in Texas. A defendant can avoid a forum by structuring his transactions so that he does not profit from the forum's laws and does not subject himself to its jurisdiction. *Burger King*, 471 U.S. at 472, 105 S.Ct. 2174; *Moki Mac*, 221 S.W.3d at 575; *Michiana Easy Livin' Country*, 168 S.W.3d at 785. Citrin further contends that the "we are partners" document is not enforceable, and that the asserted misrepresentations are not actionable because they are at most vague statements regarding potential future activities.

Weighing the parties' arguments in light of the considerations discussed above, we conclude that Minnis and Cullen 130 have established specific jurisdiction as to Citrin individually on this record.

Citrin contracted with Minnis, a Texas resident, in contemplation of an ongoing business relationship to be performed at least in part in Texas. Citrin conducted

prolonged discussions with Minnis before signing the "we are partners" document and the Cargo Ventures Operating Agreement. In the course of these discussions, Citrin traveled to Houston in mid–2003 to meet with Minnis; communicated face-to-face with Minnis in Texas and via telephone, fax, e-mail, and mail; traveled to Houston again in mid–2004 to meet with Minnis; drafted and signed the disputed "we are partners" document in Houston; and signed the Cargo Ventures Operating Agreement individually. Minnis and Cullen 130 allege that Citrin sought to obtain the benefits of Minnis's contacts and efforts without compensating Minnis.

These circumstances differ significantly from *Michiana Easy Livin' Country,* in which the transaction at issue originated in a single outbound telephone call from a vehicle-seeking Texas resident to an out-of-state dealer. Here, in contrast, the circumstances involve multiple Texas contacts over many months in the course of an ongoing relationship that "was not unilaterally initiated by the Texas resident." *See Nogle & Black Aviation, Inc.,* 290 S.W.3d at 283; *cf. Michiana Easy Livin' Country,* 168 S.W.3d at 784. These circumstances demonstrate Citrin's purposeful contact with Texas along with an intent to obtain benefits from those contacts, and they defeat any suggestion that Citrin's business-related presence in Texas was merely "random, isolated, or fortuitous." *Michiana Easy Livin' Country,* 168 S.W.3d at 785; *see also GJP, Inc. v. Ghosh,* 251 S.W.3d 854, 879 (Tex.App.-Austin 2008, no pet.) ("We cannot agree . . . that [the defendant's] physical presence in Texas when closing the sale is 'fortuitous' rather than 'purposeful' in the sense the United States and Texas supreme courts have employed those concepts."); *cf. Info. Servs. Group, Inc. v. Rawlinson,* No. 14–09–00242–CV, 2009 WL 3643515, at *6 (Tex.App.-Houston [14th Dist.] Nov. 5, 2009, no pet. h.) (". . . Rawlinson did not elect to visit Texas; it is undisputed that he attended the conferences at [the plaintiff's] direction.").

These multiple contacts culminated in the Cargo Ventures Operating Agreement, which obligated Minnis and Citrin to "devote such time, attention, and effort to the Company as is reasonably necessary for the management of the Company and the conduct of its business." Minnis performed his obligations under the Cargo Ventures Operating Agreement in Texas. In his affidavit, Minnis states that he actively pursued and developed potential projects, assisted in bringing potential projects to closing, and participated in ongoing management and decision-making responsibilities from his office in Texas. These facts demonstrate that the parties' contractual dispute has a "'substantial connection'" with Texas. *See Burger King,* 471 U.S. at 479, 105 S.Ct. 2174 (original emphasis) (quoting *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)).

In light of this evidence, the presence of a New York choice of law provision in the Cargo Ventures Operating Agreement is not dispositive and is outweighed by the other Texas-centered contacts discussed above. The evidence of Texas-based contractual performance in this case reinforces the exercise of specific jurisdiction. *See* Tex. Civ. Prac. & Rem.Code Ann. § 17.042(1); *Nogle & Black Aviation, Inc.,* 290 S.W.3d at 283 (upholding exercise of personal jurisdiction in Texas over nonresident based on contract designed to benefit from the skills of a Texas resident who performed the contract in Texas); *Fleischer,* 270 S.W.3d at 338 (contract calling for performance in Texas supported jurisdiction in Texas).

Citrin also is alleged to have made misrepresentations that induced Minnis to sign the "we are partners" document in Houston; these misrepresentations are alleged to have been made face-to-face to Minnis in Houston, and via faxes, e-mails, and mail sent to Minnis in Houston. Citrin made additional alleged misrepresentations during multiple telephone calls to Minnis in Texas to obtain Minnis's consent, on behalf of Cullen 130, to pursue transactions with Millennium Partners. These multiple, significant contacts provide additional support for the exercise of personal jurisdiction over Citrin individually in Texas. *See Gernsbacher,* 269 S.W.3d at 165 (series of fraudulent misrepresentations made to Texas resident to induce participation in transaction supported jurisdiction); *Fish,* 948 S.W.2d at 890 (pre-contract negotiations consisting of personal trips to Texas, telephone calls, mail, and faxes to and from Texas supported jurisdiction). When Citrin responds by arguing that the alleged misrepresentations are too vague or otherwise not actionable, and that the "we are partners" document is not enforceable, he invites us to resolve the merits of Minnis's and Cullen 130's claims against him. Abundant case law teaches that we should not reach the merits of the parties' dispute in the course of addressing personal jurisdiction, and we decline to do so here. *See, e.g., Pulmosan Safety Equip. Corp.,* 273 S.W.3d at 839.

This record supports the trial court's exercise of specific jurisdiction over Citrin individually and establishes a substantial connection between Citrin's Texas contacts and the operative facts of the litigation.

## II. Citrin Holdings LLC

 We now turn to personal jurisdiction over Citrin Holdings, a Delaware limited liability company owned solely by Citrin with its principal place of business in New York. Citrin Holdings was the majority owner of Cargo Ventures, Cargo Investors, and Cargo Investors II. Cullen 130 was the minority owner of these entities.

A threshold question arises regarding the universe of contacts that should be considered as to Citrin Holdings. Because it was formed in October 2004, Citrin Holdings contends that Texas contacts arising from Citrin's individual activities before that time are not germane to deciding whether it is subject to personal jurisdiction. Minnis and Cullen 130 contend that pre-October 2004 contacts can be considered because Citrin testified that he had planned to create Citrin Holdings while he was negotiating with Minnis. We base our analysis below as to Citrin Holdings on contacts arising when Citrin Holdings was created in October 2004 and thereafter. Regardless of Citrin's individual intent before October 2004 to create Citrin Holdings at some later date, we cannot attribute to Citrin Holdings a purpose to do business in Texas based upon contacts arising before this entity existed and before it conceivably could have done any business anywhere. *See Michiana Easy Livin' Country,* 168 S.W.3d at 784–85 (purposeful availment must consider the defendant's own actions).

To support the exercise of personal jurisdiction, Minnis and Cullen 130 rely heavily on Citrin Holdings' execution of the Cargo Ventures Operating Agreement in October 2004, the Cargo Investors Operating Agreement in March 2005, and the Cargo Investors II Operating Agreement in January 2006. Citrin Holdings and Cullen 130 constitute the entire membership of each entity. On this record, Cullen 130 performed its obligations and activities under each operating agreement in Texas. Minnis and Cullen 130 assert that Citrin Holdings regularly communicated

with them in Houston and sent a series of notices to Houston in furtherance of the operating agreements governing Cargo Ventures, Cargo Investors, and Cargo Investors II. Citrin Holdings made alleged misrepresentations to induce Minnis and Cullen 130 into authorizing transactions with Millennium Partners. Minnis and Cullen 130 allege these misrepresentations were made in a series of communications to Minnis and Cullen 130 in Texas.

For its part, Citrin Holdings stresses that each of the operating agreements contains a choice of law clause selecting New York law (as to Cargo Ventures) or Delaware law (as to Cargo Investors and Cargo Investors II). Citrin Holdings also relies heavily on *TeleVentures, Inc. v. Int'l Game Tech.*, 12 S.W.3d 900 (Tex.App.-Austin 2000, no pet.), in arguing that it did not purposefully avail itself of the privilege of doing business in Texas.

The dispute in *TeleVentures* arose after IGT, a Nevada corporation with its principal place of business in Nevada, signed two letters of intent in late 1995 with TeleVentures, a Texas corporation with its principal place of business in Texas. *Id.* at 904. The letters addressed the companies' joint efforts to develop devices that would allow guests to play casino-style games on their hotel televisions. *Id.* Under these letters, the parties stated their intent to sign a formal agreement if preliminary tests of the in-room hotel gaming system were satisfactory. *Id.* at 904–05. IGT and TeleVentures communicated via personal visits, faxes, letters, and telephone calls for more than a year thereafter. *Id.* at 905. TeleVentures's employees traveled to Nevada, but no IGT employees or representatives came to Texas. *Id.* The parties never signed a formal agreement; instead, IGT sent a letter to TeleVentures in Texas in January 1997 terminating all relations between the two companies. *Id.* The ter-

mination letter prompted TeleVentures to sue IGT for breach of contract, breach of fiduciary duty, fraud in the inducement, fraud, negligent misrepresentation, and tortious interference. *Id.*

The appellate court concluded that neither the letters of intent nor communications directed to TeleVentures in Texas provided a sufficient basis for specific jurisdiction over IGT in Texas. *Id.* at 909. In so holding, the court stressed that TeleVentures's role in the project evaporated after IGT chose a technological configuration that effectively excluded TeleVentures from further participation. *Id.* TeleVentures nonetheless continued to develop marketing tools and a device called the "game cube" that IGT never used, but these unilateral activities by TeleVentures were insufficient to establish purposeful availment by IGT. *Id.* "Although IGT had knowledge of the game cube, IGT neither required nor requested it." *Id.* The court also noted that the second letter of intent contemplated the creation of a partnership between IGT and TeleVentures calling for performance in Nevada, and that TeleVentures changed its state of incorporation from Texas to Nevada during its relationship with IGT. *Id.* at 905, 910. The court concluded that "[t]he terms of the letters of intent and the history of the parties' negotiations do not reveal purposeful conduct by IGT sufficient to subject it to the jurisdiction of the Texas district court." *Id.* at 910.

The circumstances here involving Citrin Holdings are distinguishable from those at issue in *TeleVentures*, in which the Texas corporation's role diminished over time and the center of gravity of the parties' relationship shifted towards Nevada. Unlike *TeleVentures*, negotiations here ripened into three formal contracts—including the Cargo Ventures Operating

Agreement—to which Citrin Holdings was a party.

In contrast to *TeleVentures*, in which the parties' activities migrated away from Texas, the activities at issue here maintained a consistent Texas connection and focus sufficient to establish a purpose by Citrin Holdings to do business in Texas. Citrin Holdings contracted to create Cargo Ventures, which conducted day-to-day business from 2004 until late 2006 through Minnis as a Houston-based Cargo Ventures employee. The process leading to the Cargo Ventures Operating Agreement was not unilaterally initiated or pursued by Minnis or Cullen 130. Additionally, Cargo Ventures does not challenge the exercise of personal jurisdiction over it by a Texas court. This latter fact underscores that contractual performance occurred in Texas, and diminishes the importance of the New York choice of law provision contained in the Cargo Ventures Operating Agreement.

The circumstances here more closely parallel those described in *Nogle & Black Aviation*. "The doctrine of purposeful availment recognizes that a defendant can make choices to avoid benefitting from activities in Texas." *Nogle & Black Aviation, Inc.*, 290 S.W.3d at 283 (citing *Moki Mac*, 221 S.W.3d at 575, and *Michiana Easy Livin' Country*, 168 S.W.3d at 785). "Even though N & B may have made some such choices, such as not locating any employees or offices in Texas and not targeting the Texas market, it specifically chose to use the work of this Texas resident." *Nogle & Black Aviation, Inc.*, 290 S.W.3d at 283. "That work was performed in Texas. . . ." *Id.* These circumstances mean it is "not unreasonable" to expect litigation in Texas arising in connection with the performance of a contract in Texas by an entity with whom Citrin Holdings purposefully chose to contract. *See id.; see also*

*Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 340 (Tex.2009) ("[W]e have found that, even in instances where a contract was signed in another state, an out-of-state company with no physical ties to Texas still has minimum contacts with Texas when it is clear the company purposefully directed its activities towards Texas."). Accordingly, the district court properly concluded on this record that specific jurisdiction exists as to Citrin Holdings.

### III. Cargo Investors LLC and Cargo Investors II LLC

Minnis and Cullen 130 contend that Cargo Investors and Cargo Investors II are subject to general and specific jurisdiction because (1) Cullen 130, a member of both Cargo Investors and Cargo Investors II, maintains an office in and operates out of Texas; and (2) Minnis and Cullen 130 performed work on behalf of Cargo Investors and Cargo Investors II in Texas. Appellants contend that the record does not support a finding that Minnis or Cullen 130 conducted work on behalf of Cargo Investors or Cargo Investors II from Texas.

In support of their special appearances, Cargo Investors and Cargo Investors II submitted an affidavit signed by Jacob Citrin. Among other things, Citrin averred that these two entities

- "simply hold equity interests in certain investments, but do not offer or provide real estate development or property management services;"
- have no employees; and
- have never been organized under Texas law, never maintained an office or other place of business in Texas, do not conduct any business in Texas, have never owned or leased property in Texas, and do not maintain bank accounts in Texas.

Citrin further stated that "Minnis was never an employee of Cargo Investors I or Cargo Investors II, and to my knowledge as the manager of both entities, neither Minnis nor Cullen 130 conducted business on behalf of Cargo Investors I or Cargo Investors II." Citrin echoed these assertions in his deposition testimony.

Minnis filed an affidavit in response to the special appearances in which he referred to Cargo Ventures, Cargo Investors and Cargo Investors II collectively as the "Cargo Entities." Minnis averred that

- he has lived in Houston his entire life;
- his primary residence is in Houston;
- Cullen 130 is based solely in Houston, where it has been based since its inception;
- "From 2004 until late 2006, I conducted business on behalf of, and provided services to, the three Cargo Entities on a day-to-day basis from my office in Houston, Texas;" and
- "I actively pursued and developed potential projects, assisted in bringing potential projects to closing, participated in the ongoing management and direction of consummated projects, and fulfilled my management and decision-making responsibilities for the Cargo Entities based out of Texas."

Cargo Investors and Cargo Investors II thereafter filed a supplemental affidavit signed by Jacob Citrin, in which he disputed the accuracy of Minnis's statement that Minnis conducted business on behalf of all three Cargo Entities on a day-to-day basis in Texas. Citrin asserted that "[t]he vast majority, if not all, of Mr. Minnis' work for our business together was on behalf of Defendant Cargo Ventures." Citrin added, "Although Mr. Minnis was given the title of President of Cargo Investors I, he did not actually do anything meaningful as a result of having that title. With regard to Cargo Investors II, he was not even

conferred with any title, and performed no work for that holding company." Citrin also signed a second supplemental affidavit in which he disputed the accuracy of Minnis's assertion "that he performed work to identify and develop properties to be owned by Cargo Investors I and Cargo Investors II." Cargo Investors and Cargo Investors II also point to an excerpt from Minnis's deposition in which Minnis agreed with the assertion that "all of the for-a-fee development work that you and Jake [Citrin] did together [was] done through Cargo Ventures...."

The record here demonstrates that a fact dispute exists regarding the extent to which Minnis's and Cullen 130's Texas activities were performed on behalf of Cargo Investors and Cargo Investors II. As noted earlier, the district court did not file findings of fact; therefore, all facts necessary to support the trial court's ruling and supported by the evidence are implied in favor of the trial court's decision. *Marchand*, 83 S.W.3d at 794–95. We conclude that the evidence here is legally and factually sufficient to support the district court's implied finding that Minnis and Cullen 130 acted on behalf of Cargo Investors and Cargo Investors II when they performed activities in Texas. The activities Minnis and Cullen 130 performed in Texas suffice to establish specific jurisdiction in Texas as to Cargo Investors and Cargo Investors II because these activities (1) are attributable to these appellants; (2) are not random, isolated, or fortuitous; and (3) were designed to confer a benefit, advantage or profit. *See Michiana Easy Livin' Country*, 168 S.W.3d at 785. Furthermore, the claims at issue in this litigation arise from and relate to these contacts with Texas. *Guardian Royal*, 815 S.W.2d at 228. These contacts suffice to establish specific jurisdiction as to Cargo Investors

and Cargo Investors II.[3]

### C. Fair Play and Substantial Justice

■ Having concluded that the Texas contacts of Citrin, Citrin Holdings, Cargo Investors, and Cargo Investors II demonstrate purposeful availment and are substantially connected to the operative facts of the litigation, we next must determine whether exercising personal jurisdiction over appellants offends traditional notions of fair play and substantial justice.

To answer this question, the court considers (1) the burden on the defendant; (2) the interests in the forum state in adjudicating the dispute; (3) the plaintiff's interests in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the states in furthering fundamental substantive social policies. *Burger King*, 471 U.S. at 476–77, 105 S.Ct. 2174. Only in rare cases will the exercise of personal jurisdiction offend traditional notions of fair play and substantial justice. *Retamco Operating, Inc.*, 278 S.W.3d at 341–42. The defendant bears the burden of establishing that the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice. *Conner*, 944 S.W.2d at 411.

■ After considering all of the factors, we conclude that the exercise of personal jurisdiction in this case is consistent with traditional notions of fair play and substantial justice. Appellants contend that defending this suit in Texas would be a "considerable burden" because (1) Citrin is a New York resident, and (2) Citrin Holdings, Cargo Investors, and Cargo Investors II are based in New York. Appellants may well incur greater expenses defending this suit in Texas compared to New York, but that is true for any nonresident defendant. *See id.* Distance to travel is generally not a significant consideration due to modern transportation. *See Gernsbacher*, 269 S.W.3d at 168. Further, Citrin traveled to Texas to personally meet with Minnis on two separate occasions prior to signing the "we are partners" document and Cargo Ventures Operating Agreement. Also, defendant Cargo Ventures submitted to jurisdiction in Texas. Requiring Minnis and Cullen 130 to litigate their claims against the defendants in separate jurisdictions would be (1) inefficient; (2) burdensome on Minnis and Cullen 130; and (3) a waste of judicial resources. *See Kelly v. Gen. Interior Constr., Inc.*, 262 S.W.3d 79, 86 (Tex.App.-Houston [14th Dist.] 2008, pet. granted).

---

**3.** For diversity purposes in federal court, the citizenship of a limited liability company's members is attributed to the LLC itself. *See, e.g., Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir.2008) ("[L]ike limited partnerships and other unincorporated associations or entities, the citizenship of a LLC is determined by the citizenship of all of its members.") (citations omitted). However, personal jurisdiction is a separate inquiry. *Cf. Goforit Entm't LLC v. Digimedia.com L.P.*, 513 F.Supp.2d 1325, 1331 (M.D.Fla.2007) (Rule for measuring citizenship in diversity cases does not mean that a limited partnership necessarily is subject to personal jurisdiction in every state of which its partners are citizens; "A limited partnership does not nec-

essarily derive any benefit from the forum merely by virtue of having a limited partner there, nor does it necessarily do business there."). The personal jurisdiction determination in this case does not depend upon attributing Texas citizenship to LLCs. Instead, it rests upon a sufficiently supported implied finding that the Texas-based activities of Minnis and Cullen 130 also are the Texas-based activities of Cargo Investors and Cargo Investors II. In light of this conclusion, we do not reach the parties' remaining contentions regarding specific jurisdiction as to Cargo Investors and Cargo Investors II. We also do not address general jurisdiction. *See Shapolsky*, 56 S.W.3d at 135.

After weighing all of the relevant factors, we conclude that exercising personal jurisdiction over appellants would not offend traditional notions of fair play and substantial justice.

### Conclusion

We reject the issues raised on appeal and affirm the trial court's order denying the special appearances of Citrin, Citrin Holdings, Cargo Investors, and Cargo Investors II.

Former Justice GUZMAN not participating.