ACCEPTED
01-14-00863-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
2/17/2015 5:49:15 PM
CHRISTOPHER PRINE
CLERK

**No. 01-14-00863-CV**

**IN THE FIRST COURT OF APPEALS**
**HOUSTON, TEXAS**

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

2/17/2015 5:49:15 PM

CHRISTOPHER A. PRINE
Clerk

*WEATHERFORD ARTIFICIAL LIFT SYSTEMS, INC.,*
*Appellant,*

*v.*

*A&E SYSTEMS SDN BHD,*
*Appellee.*

**On Appeal from the 295th Judicial District Court of Harris County, Texas**
**Cause No. 2012-62091**

**APPELLANT'S REPLY BRIEF**

**BAKER & MCKENZIE LLP**
Brendan D. Cook
State Bar No. 04721700
Brendan.Cook@bakermckenzie.com
Chelsea M. Keeton
State Bar No. 24083296
Chelsea.Keeton@bakermckenzie.com
Brandon E. Caire
State Bar No. 24064991
Brandon.Caire@bakermckenzie.com
700 Louisiana, Suite 3000
Houston, Texas 77002-2716
(713) 427-5000
(713) 427-5099 (Fax)

**COUNSEL FOR APPELLANT**
**WEATHERFORD ARTIFICIAL LIFT**
**SYSTEMS, INC.**

## TABLE OF CONTENTS

**Summary** .......................................................................................................1

I.      A&E Impermissibly Narrows the "Minimum Contacts"
Analysis. ...................................................................................3

II.      A&E's Purposeful Contacts .............................................................5

         A.      A&E Custom-Designed and Marketed its Products
Directly to Texas-based Weatherford. .....................................7

         B.      A&E CEO Arthur Haycox Engaged in Numerous Email
Communications With Weatherford From the Summer of
2009 through 2010. ..................................................................8

         C.      Weatherford Purchased From A&E, and A&E Shipped to
Weatherford, the Very Products at Issue in This Dispute. ........9

         D.      The Exit Agreement Creates an Ongoing Relationship
with Texas Resident Weatherford and Establishes a
Substantial and Continuing Relationship with the Forum
State. .......................................................................................11

III.      The Operative Facts of Weatherford's Claims are
Substantially Connected, and Arise Out of, A&E's
Contacts with the Forum State. ..........................................................13

IV.      Any Contacts that Weatherford had With A&E USA are
Attributable to A&E, and the Fact That A&E USA Also
Has Contacts With Texas Does Not Eviscerate A&E's
Many Direct Contacts With Texas. .....................................................16

**Conclusion & Prayer** ....................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*BMC Software Belgium, N.V. v. Marchund*,
83 S.W.3d 789 (Tex. 2002)................................................................................16

*Burger King v. Rudzewicz.*
471 U.S. 462 (1985)...................................................................................2, 3

*Citrin Holdings L.L.C. v. Minnis*,
305 S.W.3d 269 (Tex. App.—Houston [14th Dist.] 2013, pet. filed)....11, 12, 15

*Gonzalez v. AAG Las Vegas, LLC*,
317 S.W.3d 278 (Tex. App.—Houston [1st Dist.] 2009, pet.
denied)...........................................................................................................6

*Hoagland v. Butcher*,
2014 Tex. App. LEXIS 12979 (Tex. App.—Houston [14th Dist.]
Dec. 4, 2014, no pet.)................................................................................5, 6

*Information Services Group, Inc. v. Rawlinson*,
302 S.W.3d 392 (Tex. App.—Houston [14th Dist.] 2009, pet.
denied)........................................................................................................4, 6

*IRA Res. v. Griego*,
221 S.W.3d 592 (Tex. 2007) ............................................................................7

*Mikuni Corp. v. Foster*,
2012 Tex. App. LEXIS 404 (Tex. App.—Houston [1st Dist.] Jan.
19, 2012, no pet.) .............................................................................................17

*Moki Mac River Expeditions v. Drugg*,
221 S.W.3d 569 (Tex. 2007) .............................................................................5

*Morris Indus. v. Trident Steel Corp.*,
2011 Tex. App. LEXIS 9480 (Tex.App.—Houston [1st Dist.] Dec.
1, 2011) .............................................................................................1, 17, 18

*Schott Glas v. Adame*,
178 S.W.3d 307 (Tex. App.—Houston [14th Dist.] 2005, pet dism'd) ......................................................................................18

**Statutes**

Tex. Civ. Prac. & Rem. Code 17.042(1)..................................................................12

## SUMMARY

In its Brief of Appellee (the "Response" or "Response Brief"), A&E unilaterally and constrictively redraws the boundaries of minimum contacts analysis so as to include only a few carefully chosen contacts; in the process of doing so, A&E asks the Court to turn a blind eye to almost the entirety of the Parties' year-long business relationship. All the while, A&E continues to realize a double profit by re-selling products that Weatherford purchased and then returned, without refunding to Weatherford the purchase price of the products in question. A&E's newly-fashioned test both defies controlling Texas law and mocks principles of fair play and substantial justice. In view of the many contacts A&E has made with Texas relating to this case, the Court must exercise jurisdiction and allow Weatherford to recover the funds that A&E rightfully owes it.

Specific jurisdiction exists where: "(1) the non-resident purposefully directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there, and (2) the controversy arises out of or is related to the non-resident's contacts with the forum state." *Morris Indus. v. Trident Steel Corp.*, 2011 Tex. App. LEXIS 9480 (Tex.App.—Houston [1st Dist.] Dec. 1, 2011) (emphasis added). The test for whether the controversy "arises out of

1

or relates to" the non-residents contacts with the forum state is whether there is a "substantial connection" with the litigation's operative facts and the non-resident.

In its Response, A&E selectively distills the "operative facts" of the lawsuit in an attempt to distract the Court from the true nature of the Parties relationship and the essence of this dispute. In doing so, it demands that the Court view the dispute between the Parties through a very different lens than the one that the law requires. At its core, the Parties' dispute concerning minimum contacts may be condensed into one question:

> In weighing A&E's Special Appearance, may the Court consider the collective import of the many contacts it made with Texas in the interest of using Weatherford to distribute its products, or is the Court limited to only two or three narrowly-drawn contacts occurring at the precise time and place that an agreement to return those products was finalized?

While the parties no doubt have some other disagreements, the Court, were it to resolve this question, can fairly easily determine whether or not the A&E's direct contacts with Texas should subject it to Texas courts' jurisdiction.

Weatherford submits that in determining which contacts to analyze, the Court should include all contacts made in furtherance of the Parties' relationship in accord with the United States Supreme Court's holding in *Burger King v. Rudzewicz*. 471 U.S. 462 (1985). *Burger King* mandates that, in addition to a parties' contract alone, "prior negotiations and contemplated future consequences, along with the terms of the contract **and the parties' actual course of**

2

**dealing** . . . must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Id.* at 479. In making sustained and deliberate contact again and again with Texas in its attempt to induce Weatherford to distribute its products worldwide, there can be no doubt that A&E anticipated being haled into a Texas court should it refuse to refund Weatherford as agreed once those products were returned.

**ARGUMENT IN REPLY**

## I.    A&E Impermissibly Narrows the "Minimum Contacts" Analysis.

A&E Malaysia contends that there is not a substantial connection between the operative facts of this litigation and A&E's purposeful contacts with the forum state. According to A&E, the only "contacts" that bear any weight on the Court's analysis are (1) the location where the final terms of the Exit Agreement between the Parties were negotiated (i.e., Malaysia), and (2) A&E's refusal to remit payment from Malaysia.

Of course, the scope of "minimum contacts" is much broader than that, and the operative facts of this litigation relate to much more than simply where the Exit Agreement was negotiated or where the money that A&E owes Weatherford is located. In actuality, the "operative facts" that will be the focus at trial include A&E's continued efforts to create and benefit from a business relationship with Weatherford that would largely be executed in Texas, the representations and

3

communications exchanged between the Parties regarding what they each expected from each other with regard to that business relationship, A&E's promises to refund the money that Weatherford paid for the Products, the "falling out" that eventually occurred between the Parties, the instructions given to Richard Hoyland from Arthur Haycox in Malaysia regarding the issuance of the Credit Notes, and A&E's inspection and re-sale, from Malaysia, of the Products first paid for by Weatherford. *Information Services Group, Inc. v. Rawlinson*, 302 S.W.3d 392, 398 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (stating that "to identify the operative facts of the litigation, we select those facts that would be the focus of the trial").

These facts comprise, surround, and bear heavily on the business relationship between the parties. Accordingly, neither that relationship, nor the numerous contacts A&E made with Texas in furtherance of it, can be disregarded. As is well known to the Parties and now to the Court, that business relationship eventually failed, and the circumstances surrounding that relationship's unraveling form the subject of this dispute. However, in order to escape the jurisdiction of the Court and force Weatherford to litigate against a non-existent entity, A&E now adopts the untenable position that the majority of its contacts with Weatherford in developing the failed business relationship are not substantially connected to Weatherford's claims. That position is inapposite to Texas law.

4

In deciding whether there is specific jurisdiction over a nonresident defendant where a contract, such as the Exit Agreement, is involved, Texas courts will consider the contract at issue "a**gainst a backdrop of 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'**" *Hoagland v. Butcher*, 2014 Tex. App. LEXIS 12979, *19–20 (Tex. App.—Houston [14th Dist.] Dec. 4, 2014, no pet.). A&E would rather the Court ignore this "backdrop" of prior negotiations, contemplated future consequences, and the terms of the parties course of dealing as considerations that are "irrelevant" to the Court's analysis. (Response Brief 19) They are not at all irrelevant. When properly considered, it is certain that A&E purposefully availed itself of the benefit of doing business in Texas and that Weatherford's claims against A&E arise out of and relate to that purposeful availment.

## II.    A&E's Purposeful Contacts

"Minimum contacts are sufficient for personal jurisdiction when the nonresident defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007). Texas courts consider "three factors to determine whether a nonresident purposely availed himself of the privilege of conducting activities in Texas: (1) the

5

defendant's contacts with the forum, not the unilateral activity of another party; (2) whether the contacts were purposeful rather than random, isolated or fortuitous; and (3) whether the defendant has sought some benefit, advantage, or profit by availing himself of the jurisdiction." *Hoagland,* 2014 Tex. App. LEXIS at \*11.

A&E's contacts with the forum state were of its own intent, not merely reactions to the unilateral activity of a Weatherford. Those contacts were deliberate, not random, and were committed purely out of A&E's desire to benefit from doing business in Texas and with a Texas resident. In these ways, A&E's contacts are far more purposeful than those of the nonresident defendants in either the *Rawlinson* or *Gonzalez* cases that it cites. (Response Brief 22–25 (*citing Information Services Group, Inc. v. Rawlinson*, 302 S.W.3d 392 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); *Gonzalez v. AAG Las Vegas, LLC,* 317 S.W.3d 278 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)) In each of those cases, the nonresident defendant's actions were not committed for the purpose of benefiting or with the intent to benefit from business in Texas.[1] Each of those cases are very different from the one at bar, in which A&E has deliberately sought the benefits and advantages of doing business in a Texas forum and tirelessly pursued

---

[1] In *Gonzalez*, the nonresident defendant worked for a car dealership in Nevada, was employed there, and the question of his breach of fiduciary duty arose from and related to his actions conducted in Nevada. *Gonzalez*, 317 S.W.3d at 284.  In *Rawlinson*, the nonresident defendant's actions at issue were those conducted in the UK, and did not seek the benefit of the business of a Texas forum. *Rawlinson*, 302 S.W.3d at 397.

that benefit through intentional and purposeful contacts aimed at Texas resident Weatherford and the forum state of Texas.

### A. A&E Custom-Designed and Marketed its Products Directly to Texas-based Weatherford.

"Targeting marketing efforts in a state to generate business there suffices to justify jurisdiction in disputes arising from that business." *IRA Res. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007). A&E marketed its products specifically to Weatherford in multiple ways. First, A&E specially designed its products with Weatherford branding in an attempt to persuade Weatherford to serve as its global distributor, selling A&E products to end users around the world from its Texas headquarters. A&E USA has previously referred to the products sent to Weatherford as "special order goods to accommodate Weatherford's specific needs." (CR 107) These goods were not mere commodities but customized products that were specifically branded for distribution by Texas-based Weatherford and shipped from A&E in Malaysia to Texas for Weatherford's distribution to end users.

A&E did not merely design and ship the "special order goods" to Weatherford in Texas. It also sent Simon Haycox, its technical expert, to Houston to perform complimentary demonstrations of the products to Weatherford representatives in Texas in an attempt to cement the Parties' relationship and ensure Weatherford understood how to distribute and use the product. Notably,

7

A&E freely admits in its Response that Simon Haycox was an employee of A&E and **not** A&E USA, despite previously misrepresenting to the trial court that "it has never had an employee or officer in Texas." (CR 120, 130; Response Brief 7) Haycox's visit to Houston and demonstrations of A&E's products there are unquestionably part a purposeful marketing effort by A&E—not A&E USA—to secure Weatherford's business in Texas. Another A&E employee, Tim Davison, specially tailored marketing tools such as presentations and brochures to those that A&E believed would best appeal to Weatherford's clients in Texas and throughout the United States. (CR 258)

> **B.    A&E CEO Arthur Haycox Engaged in Numerous Email Communications With Weatherford From the Summer of 2009 through 2010.**

Arthur Haycox, A&E's CEO, and Weatherford engaged in regular conversations by e-mail regarding how the two parties would do business together globally, beginning in the summer of 2009 when Haycox first sent A&E marketing materials to Weatherford. (CR 189) While these email contacts with Texas resident Weatherford, were they standing alone, might not suffice to support jurisdiction, they are, contrary to A&E's contentions, certainly Texas contacts. Furthermore, they are only one facet of A&E's sustained and continuous purposeful contacts both in Texas and with Texas resident Weatherford.

Despite Haycox's alleged dual role as both CEO of A&E and Manager of A&E USA, these contacts are unquestionably contacts of A&E for multiple reasons, and any implied finding otherwise goes against overwhelming evidence to the contrary. In contrast to A&E's submission, Weatherford representative Todd Travis noted that he always "**understood [Haycox] to be the CEO of A&E Systems Sdn Bhd and the head of the A&E Group as a whole, which is how he always presented himself.**" (CR 189) The emails found in the record emphatically confirm Travis's statement. Throughout the Parties' relationship, all email contacts from Haycox to Weatherford in Texas solely reflect Haycox's CEO position at A&E. (CR 256, 258, 326, 341, 344) Furthermore, at the start of the Parties' relationship, Haycox could not have been acting as a representative of A&E USA, because Defendant A&E USA did not even exist at the time.[2] (Response Brief 3)

### C. Weatherford Purchased From A&E, and A&E Shipped to Weatherford, the Very Products at Issue in This Dispute.

A&E, attempting to protect itself from Texas jurisdiction by using A&E USA as a commercial shield, characterized its relationship to A&E USA thusly:

> When A&E USA would receive a purchase order from a United States-based company, A&E USA would place an order with A&E Malaysia for the manufacture of the equipment or products specified. Upon A&E USA's receipt of payment from the United States-based

---

[2] A predecessor to A&E USA was in existence at that time, as A&E notes, but neither A&E nor Weatherford allege that predecessor entity to have had any contact with Weatherford.

9

customer, A&E USA would pay A&E Malaysia a portion of the payment received for the manufacture of the products, pursuant to the parties' contractual agreement, which was cost plus 30%. (Response Brief 5)

Weatherford agrees that the process described is a "common international transaction," but the process A&E describes in its Response differs drastically from the process used in this dispute.

In actuality, A&E dealt directly with Weatherford in providing the products at issue in this case. Prior to the transaction, A&E confirmed that, rather than issuing purchase orders to A&E USA, "**Purchase order[s] [were] to be made out to A&E Systems Sdn Bhd, No. 26, Jalan Pendafter U1/54, Seksyen U1, Glenmarie, 40150 Shah Alam, Selangor Darul Ehsan, Malaysia.**" (CR 341) While Weatherford did include A&E USA on its purchase order for the products, Haycox quickly caught Weatherford's mistake, noting that the orders had to be made to A&E "**to be of any use.**" (CR 344) Weatherford did not formally issue new purchase orders directly to A&E, but there was no need to, as it was clear from the circumstances that A&E had received notice of the orders in question regardless of their original addressee. As A&E's own CEO has observed, an order placed to A&E USA would have been useless, as the party Weatherford was doing business with was A&E.

Nevertheless, Weatherford submitted payment for the products **directly** to A&E, who **directly** accepted the payment. (CR 236) A&E then **directly** shipped

10

the product from its warehouses in Malaysia to Weatherford in Houston. (CR 327–329) Furthermore, it is untrue that "Weatherford made a deliberate choice to issue purchase orders to A&E USA and not A&E Malaysia." (Reply Brief 5). In fact, the largest purchase order of $651,990.54 was issued to Pangtong Investment & Management, the Hong Kong intermediary (used for accounting purposes) who served as Weatherford's direct line to A&E Malaysia. (CR 89)

In summary, with respect to the very products for which Weatherford seeks compensation in this suit, those products were provided directly by A&E to Weatherford in Texas in exchange for payment to A&E from Weatherford in Texas without any substantive involvement by A&E USA at all.

**D.** **The Exit Agreement Creates an Ongoing Relationship with Texas Resident Weatherford and Establishes a Substantial and Continuing Relationship with the Forum State.**

Perhaps the most important signal of A&E's intent to benefit from the forum state is that the terms of the Exit Agreement, even taken alone, support a finding of jurisdiction over A&E because they were, in part, "specifically designed to benefit from the skills of a Texas resident who performs contractual obligations in Texas." *Citrin Holdings L.L.C. v. Minnis,* 305 S.W.3d 269, 281 (Tex. App.—Houston [14th Dist.] 2013, pet. filed). For example, the Exit Agreement envisions that:

- **"WFT and A&E remain connected via a normal vendor/client relationship."** (CR 82)

11

- **"WFT will continue to offer Alocit and Enviropeel to its clients."** A&E has not disputed that Weatherford is a Texas company, and that the marketing of the Alocit and Enviropeel products to Weatherford clients would be conducted from Weatherford's Texas offices and to Weatherford's Texas clients. (CR 82)

- **"A&E will support and have available management to demo and present to WFT clients on a global basis."** (CR 82) Again, it is obvious that at least some of these clients would be in Texas and/or would stem from Texas. Furthermore, the essential personnel needed for these demonstrations included A&E Malaysia employee Simon Haycox, who had previously traveled to Texas for the same purpose.

- "WFT to review a manager and 'link' between WFT and A&E."

Importantly, each of the above terms specifically intend to benefit from the skills and services of Texas resident Weatherford that would be performed in Texas. *Citrin*, 305 S.W.3d at 280. The "place of performance" consideration is one mandated by the Texas long-arm statute itself, which finds that a party does business in Texas when it "contracts…with a Texas resident" (regardless of where the actual "contracting" took place) and "either party is to perform the contract in whole or in part in this state." *Id.* (citing Tex. Civ. Prac. & Rem. Code 17.042(1)).

It is undisputed that Weatherford's breach of contract claim "arises out of or relates to" the terms of the Exit Agreement entered into between A&E and Weatherford. Accordingly, that agreement and the interpretation of its terms are "operative facts" that are critical to the determination of this case. Furthermore, A&E USA's counterclaim reveals that A&E itself envisioned the Exit Agreement as one that would establish "an ongoing business relationship with a Texas resident

12

to be performed at least in part in Texas," and that A&E hoped for a "substantial and continuing relationship" in Texas, prior to and in accordance with the Exit Agreement. (CR 110) Ironically, A&E points to the very same contacts—contacts that admittedly were made by A&E Malaysia, such as Simon Haycox's October 2009 training and testing visit—as Weatherford to support its own causes of action against Weatherford. (CR 107, 209)

Only now does A&E claim that "the so-called 'Exit Agreement' creates no 'substantial and continuing relationship with Texas,'" and that, in the context of determining whether the "operative facts of the litigation" are "substantially connected" to its contacts with Texas, that those very same contacts are now "irrelevant." (Response Brief 21) A&E cannot use the very same contacts that establish jurisdiction over it as a sword to recover against Texas resident Weatherford, but as a shield to preclude Weatherford from its own recovery.

## III. The Operative Facts of Weatherford's Claims are Substantially Connected, and Arise Out of, A&E's Contacts with the Forum State.

Moreover, as alleged in its Petition, Weatherford's claims for breach of contract, unjust enrichment, fraud, and negligent misrepresentation all arise from a failed business relationship in which "[t]he parties originally envisioned that A&E would tender [certain coatings products] to Weatherford, and that eventually Weatherford would act as the exclusive distributor, seller, marketer, and servicer of the Products" globally. (CR 71) In connection with this relationship, Weatherford

13

ordered and paid for certain products for distribution that A&E provided; Weatherford later determined not to use the products and returned them, expecting (as the parties had agreed) payment for the returned products. Instead of providing that payment, A&E has kept Weatherford's money and realized a double profit on some of the product which it has sold.

Despite the fact that the very goods for which Weatherford seeks compensation in this suit were provided by A&E in exchange for payment, A&E, in its myopic redrawing of boundaries for minimum contacts analysis, disingenuously argues that the Exit Agreement is not related to the Parties' contemplated business relationship. As A&E contends, all the actions it took in furtherance of its relationship with Weatherford, including its trip to Houston to demonstrate its products, its branding of its products for Weatherford customers, its demanded payment directly to the bank account of "A&E Systems Sdn Bhd," and its request that Weatherford market its products to Weatherford customers, are conveniently "out of bounds" for the Court's jurisdictional analysis.

The Exit Agreement, and the liability of A&E for failing to follow that agreement's terms, is unquestionably related to the Parties' business relationship and the many contacts that A&E had with Texas in furtherance of that relationship. Any sober comparison of the Exit Agreement and the Parties' relationship yields the inescapable conclusion that the two are inextricably intertwined. Not only is

14

the Exit Agreement "related to" the parties' business relationship, it was the ultimate agreement reached to consummate that relationship, albeit not in the way either party had originally intended. Indeed, the very term "Exit Agreement" indicates that the Parties necessarily had something to **exit**. The Exit Agreement was not an abrupt change of course, wholly unrelated to the Parties' prior relationship. It was instead the culmination of a relationship that had steadily grown more uneasy, a relationship which had already become unstable by March 2010. At that point, A&E CEO Arthur Haycox flew to Houston to meet with Weatherford representative David Colley, and Colley made clear at that meeting that the Parties' relationship would have to change or end.

A&E also places undue emphasis on the fact that the Parties never reached the point of executing a distributorship agreement. In doing so, A&E seems to posit that the only contacts which count in a relationship are ones culminating in the signing of a formal contract. However, contacts made in negotiating a contract are relevant to a jurisdictional analysis, even if one is not signed in the end, or if, as in this case, the parties instead sign an Exit Agreement in the end. *Citrin* 305 S.W.3d at 281 (considering a prior contract between the parties that was alleged but not produced in evidence as a contact relevant to the jurisdictional analysis).

15

**IV.** **Any Contacts that Weatherford had With A&E USA are Attributable to A&E, and the Fact That A&E USA Also Has Contacts With Texas Does Not Eviscerate A&E's Many Direct Contacts With Texas.**

Contrary to A&E's assertion, Weatherford has not waived its claims of alter ego on appeal. *BMC Software Belgium, N.V. v. Marchund*, 83 S.W.3d 789, 794 (Tex. 2002) (an appellate court reviews a trial courts grant or denial of a special appearance de novo). The facts before this Court, both as pled in Weatherford's Petition and presented in its initial Brief, make obvious that A&E USA was nothing more than the alter ego through which A&E conducted its business with Texas resident Weatherford.

"Personal jurisdiction may exist over a nonresident defendant if the relationship between the foreign corporation and its parent corporation that does business in Texas is one that would allow the court to impute the parent corporation's 'doing business' to the subsidiary." *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 798 (Tex. 2002). "To 'fuse' the parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary." *Id.*

A&E holds itself out on its own website as a "group" that is headquartered in Malaysia, with the other locations of A&E being no more than mere "offices" or "regional centres." (CR 198, 200) The existence of separate headquarters is a relevant consideration in determining whether a parent corporation is "separate"

16

from its subsidiary for jurisdictional purposes. *Mikuni Corp. v. Foster*, 2012 Tex. App. LEXIS 404 *12 (Tex. App.—Houston [1st Dist.] Jan. 19, 2012, no pet.).

Additionally, when Weatherford inquired as to why certain discounts were applied to the Credit Notes allegedly issued by A&E USA, Mille Moreno, the administrator in A&E USA's office, made clear that that information would have to come from A&E's "headquarters in Malaysia" via Arthur Haycox:

From: Millie Moreno [mailto:millie@ae-sys.com]
Sent: Tuesday, May 17, 2011 9:55 AM
To: 'Schneider, Judy F'
Subject: RE: Credit notes .

Hi Judy,

I heard the shipment arrived at our warehouse while I was on vacation last Friday I believe. It will be checked in detail next week by our General Manager when he arrives back into town next week. He left to visit a customer yesterday. I'm sorry but that's the only info I have for this week. Regarding your payment inquiry below, that info will come from our headquarters in Malaysia. Our CEO is on travel this week & returns to Malaysia middle of next week so I will ask him when he gets back. Also, I don't have any emails from you with the packing lists & B/L attached (as per our emails below). Please send those to me for my electronic files.

Thank you,
Millie

From: Schneider, Judy F [mailto:Judy.Schneider@weatherford.com]
Sent: Thursday, May 12, 2011 5:45 PM
To: Millie Moreno
Subject: RE: Credit notes .

Millie,

We would like to generate invoices for the product stored at your facility in Malaysia including the special order Red Chips. The back dating of the credits to Jan 1, 2011 should mean that the invoices would be paid this month. Is that correct?

Is there some reason that there is no credit allowance on the crate of 2.5g cans of Alocit 28.15 Pantone Red 200C? This product will be included in the return goods to Florida.

Thanks,

Judy

At the very least, A&E USA was certainly A&E's agent. "Texas contacts of an agent are attributable to the principal." *Morris Indus. v. Trident Steel Corp*, 2011 Tex. App. LEXIS 9480 *8 (Tex. App.—Houston [1st Dist.] Dec. 1, 2011).

17

"The defining feature of an agency relationship is the principal's control over the agent." *Id.* The right to control, analyzed in the agency context, "includes not only the right to assign tasks but the right to dictate the means and details of how the agent will complete the tasks." *Schott Glas v. Adame*, 178 S.W.3d 307, 315 (Tex. App.—Houston [14th Dist.] 2005, pet dism'd).

The overwhelming evidence shows that A&E controlled the vast majority, if not all, of the business operations and affairs of A&E USA, and particularly exercised that control with respect to any contact that A&E USA had with Weatherford. Both Arthur Haycox and Richard Hoyland testified that A&E explicitly controlled the means and details of how A&E USA was to conduct any business with Weatherford. (CR 282, 232, 204, 205, 341) Haycox stated that his job "as CEO" was to decide the terms of the business relationship with Weatherford. (CR 232, 204) Hoyland, in fact, testified that everyone reported to Haycox in his role as CEO, and that those above him in the A&E "hierarchy" were Simon Haycox[3] and David Lee, each of whom are only employees of A&E Malaysia. (CR 205)

Furthermore, the issuance and terms of the credit notes were explicitly made at the instruction of Haycox in his capacity as A&E Group's CEO and A&E

---

[3] Tellingly, Hoyland refers to Simon Haycox as "**Our** Technical Director." (CR 296) In that same email, he states that "Arthur has visited three times to ensure we were talking decision maker to decision maker." *Id.*

Malaysia's lead officer. (CR 216) A&E USA Manager Hoyland testified that he had "no independent thinking" when Haycox told him to issue the Credit Notes at a discounted price, and that his role was largely ministerial. (CR 216) All monetary benefit for the Products was received by A&E in its Malaysian bank account. (CR 341) All the Products bought by Weatherford were manufactured by A&E in Malaysia. (CR 236) These facts and others in the record, taken together, show that A&E USA was nothing more than an alter-ego (or at least an agent) distributor to facilitate A&E's US, and, specifically, Texas, business.

To veil itself in corporate separateness where none exists, A&E makes the conclusory statement that "Weatherford always knew it was dealing with A&E USA," as if to imply that Weatherford could only do business with A&E **or** A&E USA, and not with both entities.[4] (Response Brief 2) However, A&E USA's contacts with Weatherford occurred **in addition to** A&E's direct contacts with Weatherford as the two entities were used interchangeably by A&E in fostering A&E's relationship with Weatherford. Furthermore, Todd Travis makes clear that it was Weatherford's understanding that all interactions with the A&E Group were led by, and actually with, A&E in Malaysia. (CR 190)

---

[4] A&E emphasizes that it and A&E USA are separate entities and contends that, despite A&E's use of the two entities interchangeably, Weatherford has abandoned its alter ego argument. While Weatherford reserves all rights flowing from the fact that A&E and A&E USA utterly failed to observe any formal corporate distinctions, even if A&E and A&E USA were properly considered to be separate entities, their separateness does not provide A&E cover for its own direct contacts with Weatherford and with Texas.

A&E's repeated A&E's attempts to distinguish itself from A&E USA are distinctions that only come after A&E Malaysia already inserted itself into the litigation. As the litigation progressed, it became increasingly clear that A&E Malaysia was the actual party with whom Weatherford was involved, and that A&E USA was nothing more than a conduit through which A&E Malaysia occasionally served Texas client Weatherford, interacting directly with Weatherford in most instances. Arthur Haycox refused to be deposed as a corporate representative of A&E USA, and Weatherford was forced to allow more time for discovery than that allowed for under the Texas Rules of Civil Procedure in order for documents and deponents to be provided from Malaysia and the UK.

Furthermore, as mentioned above, A&E USA's fraud claim against Weatherford relies heavily on contacts and actions that were made not by A&E USA, but rather by its Malaysian principal. Any recovery that A&E USA may receive in its suit against Weatherford will be one realized by A&E Malaysia, as A&E USA no longer operates in the US and is a nonexistent entity. It would be a vast inequity to allow A&E to attack Weatherford under the veil of a non-functioning subsidiary based on interactions that occurred between A&E Malaysia and Weatherford, but to also find that A&E does not have to defend itself against Weatherford's own claims against it in this Court.

## CONCLUSION & PRAYER

A&E conducted over a year's worth of purposeful contacts and enjoyed the privilege of doing business with Texas-resident Weatherford, interacting directly with the forum state of Texas in order to do so. It has benefited in amounts over $800,000.00 from this business. It has already participated in the litigation considerably, providing documents and witnesses to answer discovery that its shell company, A&E USA, is incapable of providing. Despite all this, A&E now attempts to hide behind jurisdictional arguments to avoid having to pay Weatherford the amounts that Weatherford is rightfully owed. To allow it to do so would run afoul of traditional notions of fair play and substantial justice.

For these reasons, Appellant Weatherford Artificial Lift Systems respectfully prays that this Court reverse the Order entered by the trial court granting Appellee's special appearance and dismissing the action as to A&E for lack of personal jurisdiction, reinstate Appellant's claims against A&E in their entirety, remand the case to the trial court for further proceedings consistent with this Court's holdings, and grant such other and further relief to which Appellant may be justly entitled.

21

Respectfully submitted,

**BAKER & McKENZIE LLP**

By: /s/ Brendan D. Cook

    Brendan D. Cook
    State Bar No. 04721700
    Brendan.Cook@bakermckenzie.com
    Chelsea M. Keeton
    State Bar No. 24083296
    Chelsea.Keeton@bakermckenzie.com
    Brandon E. Caire
    State Bar No. 24064991
    Brandon.Caire@bakermckenzie.com
    700 Louisiana, Suite 3000
    Houston, Texas 77002-2716
    (713) 427-5000
    (713) 427-5099 (Fax)

**COUNSEL FOR APPELLANT WEATHERFORD ARTIFICIAL LIFT SYSTEMS, INC.**

**CERTIFICATE OF COMPLIANCE WITH TEX. R. APP. P. 9.4(I)(3)**

This brief complies with the length limitations of TEX. R. APP. P. 9.4(i)(2)(C) because it contains 4,909 words, as counted by the computer program used to prepare this brief, excluding the parts of the brief exempted by TEX. R. APP. P. 9.4(i)(1).

/s/ Brendan D. Cook
Brendan D. Cook

**CERTIFICATE OF SERVICE**

As required by Texas Rule of Appellate Procedure 6.3 and 9.5(b), (d), (e), I

certify that I have served this document on all other parties which are listed below

on February 17, 2015 as follows:

Bruce Coplen
Guy Cooksey
Coplen & Banks, P.C.
12651 Briar Forest Dr., Suite 100
Houston, Texas 77077
Telephone: (713) 785-5595
Fax: (713) 785-8651
*Counsel for Appellees*

By:

   ___    personal delivery

   X    mail

   ___    commercial delivery service

   ___    fax

   X    email

/s/ Brendan D. Cook
Brendan D. Cook