**Opinion issued June 30, 2015**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-14-00904-CV

————————————

**GRAMERCY ADVISOR LLC, GRAMERCY ASSET MANAGEMENT LLC, GRAMERCY LOCAL MARKETS RECOVERY FUND LLC AND GRAMERCY FINANCIAL SERVICES LLC, Appellants**

**V.**

**R. K. LOWERY, JR. L-FALLING CREEK LLC, RUSSELL A. CHABAUD, R-RAC WIMBLEDON, LLC, JOHN P. MOFFITT, J-JASON LLC, RUSSELL A. CHABAUD, TRUSTEE OF THE RUSSELL G. CHABAUD 1999 INVESTMENT TRUST, R- RUSSELL WIMBLEDON, LLC, RUSSELL A. CHABAUD, TRUSTEE OF THE ASHLEY CHABAUD 1999 INVESTMENT TRUST, R-ASHLEY WIMBLEDON, LLC, RUSSELL A. CHABAUD, TRUSTEE OF THE AUDREY CHABAUD 1999 INVESTMENT TRUST, R-AUDREY WIMBLEDON, LLC, LMC RECOVERY FUND, LLC, UNION GAS FUNDING I, L.P., RANA HOLDINGS, LLC, WESTY I LLC, AND MOGI, LLC, Appellees**

On Appeal from the 80th District Court
Harris County, Texas
Trial Court Case No. 2008-74262

# MEMORANDUM OPINION

This is our second occasion to address the trial court's special appearance rulings in this case. Plaintiffs sued numerous defendants complaining of tax investment strategies marketed to Plaintiffs for use on their federal tax returns for the tax years 2000 through 2005 ("Investment Strategies"). Defendant Financial Strategy Group (a Tennessee defendant that prepared tax returns for a Connecticut entity utilized in the Investment Strategies for two years) filed a special appearance, which the trial court denied. On interlocutory appeal, we reversed, holding that "the trial court erred in concluding that Financial Services had sufficient minimum contacts with Texas to confer Texas courts with personal jurisdiction over it." *Fin. Strategy Grp., PLC v. Lowry, Jr.*, No. 01-14-00273-CV, 2015 WL 452265, at *12 (Tex. App.—Houston [1st Dist.] Jan. 27, 2015, no pet.).

Defendants-appellants Gramercy Advisors LLC, Gramercy Asset Management LLC, Gramercy Local Markets Recovery Fund LLC, and Gramercy Financial Services LLC (collectively, "Gramercy defendants") and defendants Steamboat Capital Management LLC and Jay A. Johnston also filed a joint special appearance. Following a hearing, the trial court denied the Gramercy defendants' special appearance, and took Steamboat's and Johnston's under advisement. The Gramercy defendants then brought this accelerated appeal from the trial court's order denying their special appearance. We affirm.

2

# BACKGROUND

## A.    Plaintiffs' Allegations

Plaintiffs' petition alleges that defendants "jointly and in concert developed, promoted, sold, and implemented the Investment Strategies as a part of a conspiracy to commit fraud."[1] According to plaintiffs, defendants "counseled and advised Plaintiffs to undertake the Investment Strategies, claiming the Investment Strategies would yield a substantial profit and minimize Plaintiffs' tax liability." Plaintiffs further alleged that at the time the defendants sold the Investment Strategies to the plaintiffs, they knew—or should have known—that "the Investment Strategies would not and could not yield the investment results or tax treatment claimed." Indeed, plaintiffs' petition contends, the defendants "knew, at the time they promoted and sold the Investment Strategies to Plaintiffs, that federal authorities were investigating the legality of similar 'abusive tax shelters.'" Despite defendants' knowledge, they did not inform Plaintiffs. Defendants' motive, according to Plaintiffs, "was to extract millions of dollars in fees and commissions from Plaintiffs." As a result of their detrimentally relying on defendants' expertise, advice, and representations about the legality and propriety

---

[1]    The allegations in this background section come from Plaintiffs' petition. Because the parties disagree about the scope and characterization of Plaintiffs' claims, we quote extensively from the pleading. We have also included allegations related to other defendants to give context to Plaintiffs' allegations against the Gramercy defendants.

of the Investment Strategies, plaintiffs entered into illegal and abusive tax shelters, subjecting them to "substantial back taxes, interest, penalties, and other damages."

## B.      Allegations specific to Gramercy defendants

### 1.      Jurisdiction

Relevant to specific jurisdiction,[2] Plaintiffs' petition alleged the following as to the individual Gramercy defendants: Each is a Delaware LLC with a principal place of business in Connecticut. At relevant times, each "has done and is doing business in" Texas, and "has contracted with a corporation through its Texas office, and either party was to perform the contract in whole or in part" in Texas. Each has "committed torts, in whole or in part, in the State of Texas, including intentional tortious acts directed at a resident of the State of Texas, where the brunt of the harm was felt." Their "conduct in the State of Texas has been committed by officers, directors, employees, and/or agents . . . acting within the scope of their employment or agency." They have "purposefully availed [themselves] of the benefits and protections of the laws of the State of Texas and could reasonably anticipate being subject to the jurisdiction of the courts of the State of Texas."

### 2.      The Tax Shelter Scheme

Plaintiffs' petition describes the tax-shelter scheme and the bases for their suit:

---

[2]      Plaintiffs allege only specific, not general, personal jurisdiction over the Gramercy defendants.

4

Plaintiffs bring this action against the Strategy Defendants[3] based on their understanding of what the Internal Revenue Service (IRS) has apparently concluded during the IRS' audit of Plaintiffs' tax returns. Plaintiffs bring claims for breach of fiduciary duty, negligence/professional malpractice, negligent misrepresentation, disgorgement of unethical, excessive and illegal fees, fraudulent inducement, fraudulent concealment; declaratory judgment; fraud, civil conspiracy to commit fraud, and breach of contract against the Strategy Defendants . . . . Plaintiffs seek compensatory damages against the Defendants for damages arising from certain investment strategies that Plaintiffs entered into and utilized On their federal tax returns for the tax years 2000 through 2005 ("Investment Strategies") as set forth more fully below. Unbeknownst to Plaintiffs, the Strategy Defendants jointly and in concert developed, promoted, sold, and implemented the Investment Strategies as part of a conspiracy to commit fraud. [Morgan Lewis & Bockius LLP ("MLB")] conspired with BDO to perpetrate fraud on Plaintiffs in connection with BDO's (and specifically BDO's Tax Solutions Group) design, promotion, sale, and implementation of Plaintiffs' Investment Strategies.

. . . .

Unbeknownst to Plaintiffs, BDO Seidman entered into undisclosed and illegal business arrangements with MLB, the other Strategy Defendants . . . . Through these arrangements, BDO Seidman, and Gramercy systematically identified wealthy potential or existing clients facing substantial capital gain or income taxes. Then, playing on their position of trust, confidence, and prestige with their clients, BDO Seidman and Gramercy - in accordance with the Strategy Defendants' pre-planned and fraudulent scheme – steered clients such as Plaintiffs to the Strategy Defendants and others for legal, financial, investment, and tax advice and related products.

BDO Seidman and Gramercy advised their clients, including Plaintiffs, that their tax and investment professionals had designed proprietary tax-advantaged investment plans that would provide Plaintiffs with the potential of high return on their investments and at the same time minimize capital gain and income tax obligations.

---

[3] The "Strategy Defendants" include the Gramercy defendants, as well as BDO Seidman LLP, Sidley Austin, LLP, De Castro, West, Chodorow, Glickfelf & Nass, LLC, and Financial Strategy Group PLC.

According to the Criminal Information filed by the United States against Michael Kerekes (a former principal at BDO Seidman and member of the Tax Solutions Group), BDO Seidman, in furtherance of the conspiracy, developed a template consulting agreement for use in the tax shelter transactions. *See U.S v. Kerekes,* Information at p. 11, 16. This consulting agreement was deliberately broad and vague and did not specifically refer to the tax shelter transactions. *Id.* The purpose of the consulting agreement was to conceal the actual fees paid to BDO in connection with the tax shelter transactions so that only a portion of the fees would be considered when conducting a profitability analysis of the tax shelter transaction. *Id.* Plaintiffs were fraudulently induced to enter into these consulting agreements with BDO, as well as the agreement with Gramercy, Sidley Austin, De Castro West, and the Other Participants, in connection with the Investment Strategies.

Each of the participating Strategy Defendants knew or should have known that these purported tax advantaged investment strategies were, in reality, likely to be held by the IRS as nothing more than illegal and abusive tax shelters. To profit from their scheme, the Strategy Defendants counted on their ability to conceal the true nature of the strategies from tax authorities and Plaintiffs.

Unbeknownst to Plaintiffs, BDO Gramercy, Sidley Austin, De Castro West, Financial Strategy Group and others (including Lehman) jointly conspired to design the Investment Strategies before BDO and Gramercy, with the assistance of others including MLB and Financial Strategy, executed their plan to promote and sell the Investment Strategies to their own clients - such as Plaintiffs. Unbeknownst to Plaintiffs, Sidley Austin and De Castro West agreed that BDO Seidman and Gramercy could promise prospective clients, such as Plaintiffs, that they would receive tax opinion letters certifying the soundness and legality of the Investment Strategies being sold. For a substantial fee Sidley Austin and De Castro West issued tax opinions to Plaintiffs that purported to substantiate the bona fides of certain of the Investment Strategies. Unbeknownst to Plaintiffs, these opinion letters were not specifically tailored to Plaintiffs' specific financial situations, but were merely "fill in the blank" boilerplate opinions provided as part of a "pre-wired" scheme.

Despite the Strategy Defendants' knowledge that the IRS would likely deny the Investment Strategies, Financial Strategy and BDO

6

prepared certain federal tax returns for an entity used to implement the Investment Strategies, and the Strategy Defendants advised Plaintiffs to file individual federal tax returns implementing the Investment Strategies. Even after the Strategy Defendants learned that the IRS had begun to audit and disallow capital and other losses claimed through similar tax strategies, the Strategy Defendants continued to advise Plaintiffs to use the Investment Strategies to offset income and/or capital gains on their income tax returns.

After BDO and/or Gramercy convinced their clients to pursue the tax advantaged investment strategies, Gramercy and BDO jointly worked with each client to execute the technical portion of the Investment Strategies. . . . . At no point in time did BDO, Gramercy, Sidley Austin, De Castro West, Financial Strategy or the Other Participants ever disclose to Plaintiffs that they had fraudulently conspired together to design, promote, sell and implement the Investment Strategies, and were in no way independent from each other.

[U]nbeknownst to Plaintiffs, the Strategy Defendants designed the Investment Strategies and agreed to provide a veneer of legitimacy to each other's opinions as to the lawfulness and tax consequences of the Investment Strategies by agreeing to the representations that would be made and to issue the allegedly "independent" opinions before potential clients were solicited. Unbeknownst to Plaintiffs, these "independent" opinions were prefabricated and canned opinions used for each and every client across the United States with basic factual information inserted depending upon the client.

. . . .

Unbeknownst to Plaintiffs, the Strategy Defendants entered into the Strategy Defendants' arrangement, whereby they agreed they would solicit each other's clients and split the fees to be charged clients who executed strategies such as the Investment Strategies, including Plaintiffs. Indeed, BDO and Gramercy had an undisclosed agreement that required BDO to pay Gramercy part of the fee that the clients - including Plaintiffs - paid to BDO. Of course, neither BDO nor Gramercy disclosed this fee splitting arrangement with plaintiffs, Nothing says "conspiracy" like an undisclosed fee-splitting agreement between professional advisors who represented to the Plaintiffs that they were completely independent.

7

**3.     BDO and Gramercy "pitch" of the Investment Strategies to Plaintiffs**

Plaintiffs' petition alleges that BDO and Gramercy were responsible for pitching the Investment Strategies to Plaintiffs.   In September 2000, BDO representatives first reached out to request a meeting with certain Plaintiffs. Plaintiffs Lowry and Chabaud and their personal accountant attended with the understanding that the purpose of the meeting was to "educate Plaintiffs on the types of services and expertise BDO had to offer Plaintiffs and for BDO to become family with Plaintiffs and Plaintiffs' business."   Plaintiffs were required to sign a non-disclosure agreement at the beginning of the meeting, and then were told that "BDO had developed several 'investment' strategies that met the criteria for Plaintiffs' financial, investment and tax needs."   These strategies were described as having "significant tax benefits because they took advantage of certain loopholes contain the in the IRS code with respect to partnerships," that were "completely legal and valid."

According to Plaintiffs' petition, in this initial meeting with BDO representatives, Gramercy's role first entered the picture:

> Shanbrom [a member of BDO's Tax Group] described a particular investment strategy involving foreign distressed debt.  According to Shanbrom, Plaintiffs could invest in foreign distressed debt and after executing the proprietary strategy, Plaintiffs would be able to legally take a loss in the distressed debt through the application of certain partnership tax rules; Shanbrom and Moorman [of BDO] reassured Plaintiffs that the distressed debt strategy was completely legal and

8

informed Plaintiffs that all of the big accounting firms were implementing similar types of tax-advantaged investment strategies. Shanbrom informed Plaintiffs that he had personally engaged in a distressed debt strategy and also provided Plaintiffs with information regarding the total number of BDO's clients that had implemented these types of strategies and the combined size of these clients' strategies.

Pursuant to BDO's undisclosed agreement with Gramercy, Shanbrom recommended that Plaintiffs engage Gramercy to assist BDO in the implementation of the distressed debt strategy. . . .

Shanbrom recommended that if Plaintiffs decided to implement the distressed debt strategy, Plaintiffs should also invest substantial amounts of money (and as much money as possible) with Gramercy unrelated to the distressed debt strategy. According to Shanbrom, these unrelated investments would provide Plaintiffs with a diversified portfolio that allowed Plaintiffs to achieve higher rates of return and would, at the ·same time, strengthen Plaintiffs' position in the event the IRS audited Plaintiffs' tax returns. Specifically, Shanbrom recommended that Plaintiffs invest $15,000,000.00 with Gramercy in addition to the investments made with Gramercy for the distressed debt strategy.

Plaintiffs' allege that a Gramercy representative, Jay Johnston, was present at their second meeting, held in Texas on November 7, 2000, about the Investment Strategy. This was the first time Plaintiffs came face-to-face with or talked to a Gramercy representative:

Plaintiffs Lowry, Chabaud, and Moffitt and Plaintiffs' personal accountant and real estate attorney attended another meeting with Shanbrom and Moorman on November 7, 2000, in Houston, Texas. Defendant Jay Johnston, a principal at Gramercy, was also present at this meeting. Plaintiffs had no prior relationship with Gramercy or Jay Johnston until BDO, pursuant to their undisclosed agreement with Gramercy, introduced Plaintiffs to Gramercy at this meeting.

9

During the November 7 meeting, Shanbrom and Jay Johnston discussed in detail the steps of the distressed debt strategy with Plaintiffs and repeatedly reiterated that it was a completely legal tax-reducing strategy, Shanbrom and Jay Johnston again stressed that if Plaintiffs wanted to implement a distressed debt strategy for the 2000 tax year, Plaintiffs needed to make an investment with Gramercy in November 2000. Shanbrom and Johnston presented the distressed debt strategy as a take it or leave it offer and reiterated that Plaintiffs must make a decision almost immediately.

Shanbrom and Johnston told Plaintiffs that if the IRS challenged the validity of the distressed debt strategy, Plaintiffs would prevail. Shanbrom emphasized that BDO felt so confident about the strategy that BDO would represent Plaintiffs in any IRS audit as part of the fee Plaintiffs paid BDO to execute the distressed debt strategy. Further, Shanbrom and Johnston told Plaintiffs that Sidley Austin, a reputable law firm, would issue "independent" opinion letters confirming the propriety of the distressed debt strategy. According to Shanbrom and Johnston, Defendant R.J. Ruble (a partner at Sidley Austin) would draft the Opinion letters, Shanbrom and Johnston told Plaintiffs that Ruble was the recognized expert with respect to distressed debt strategies. Shanbrorn and Johnston advised Plaintiffs that Sidley Austin was completely "independent"' from BDO and would therefore issue "independent" opinion letters, which would provide the required legal support to confirm the propriety of the strategy and overcome any IRS challenge and, equally as important, would provide absolute penalty protection.

Shanbrom and Johnston recommended that Plaintiffs undertake a distressed debt strategy that would be implemented over a 5 year period, beginning in tax year 2000. Shanbrom and Johnston told Plaintiffs that BDO and Gramercy would handle the design and implementation of the distressed debt strategy.

. . . .

Pursuant to BDO and Gramercy's advice and instructions, Plaintiffs entered into consulting agreements with. BDO. Unbeknownst to Plaintiffs, BDO and Gramercy had an agreement that required BDO to pay Gramercy part of the fees that Plaintiffs paid to BDO. The fees paid to BDO were based on the amount of tax losses created by the

distressed debt strategy. Plaintiffs also entered into investment management agreements with Gramercy with respect to the money that Plaintiffs invested with Gramercy that was unrelated to the distressed debt strategy.

Pursuant to BDO and Gramercy's advice and instructions, Plaintiffs opened accounts and made investments (unrelated to the tax-reducing strategies) with Gramercy in November 2000.

### 4. Implementation of the Investment Strategies and the IRS Notices

Plaintiffs' petition describes the Investment Strategies undertaken in the years 2000 through 2005, as well as the IRS notices issued that bore on the legality of the strategies.

### a. IRS Notice 1999-59

On December 27, 1999, almost a full year before Plaintiffs claim the Investment Strategies were pitched to them by various defendants, the IRS issued Notice 1999-59 entitled "Tax Avoidance Using Distribution of Encumbered Property." That notice stated that the IRS and Treasury Department had become aware of "certain types of transaction . . . that are being marketed to taxpayers for the purpose of generating tax losses." Specifically, it noted that artificial losses are being created through a "contrived series of steps, [through which] taxpayers claimed tax losses for capital outlays that they have in fact recovered." It reiterated that artificial losses are not allowed for income tax purposes.

Plaintiffs petition asserts that, despite the "clear message" from the IRS in Notice 1999-59 that "purported losses arising from transactions wholly lacking in

11

'economic substance'" are disallowed, the Strategy Defendants "failed to discuss and analyze the effect and significant of this IRS Notice."

### b. IRS Notice 2000-44

In August 2000, the IRS issued another notice, Notice 2000-44 entitled "Tax Avoidance Using Artificially High Basis," which Plaintiffs allege clearly reiterated that the Investment Strategies being pitched to Plaintiffs were illegal and abusive tax shelters. This notice specified the precise transaction marketed to the Plaintiffs, under which a taxpayer purchases call options and simultaneously writes offsetting call options, transfers the option positions to a partnership, and ultimately claims that the basis in the partnership interest "is increased by the cost of the purchased call options but is not reduced under [IRC] §752 as a result of the partnership's assumption of the taxpayer's obligation." The Notice stated that the "purported losses from these transactions (and from any similar arrangements designed to produce non-economic tax losses by artificially overstating basis in partnership interest) are not allowable as deductions for Federal income tax purposes."

Plaintiffs allege that various defendants failed to tell them about the IRS's position to their detriment.

### c. 2000 Digital Option Strategy

"Plaintiffs R.K. Lowry Jr., L-Falling Creek LLC, Russell A. Chabaud, R-Rac Wimbledon, LLC, John Moffitt, J-Jason, LLC, and LMC Recovery Fund LLC entered into tax strategies involving the purchase and sale of digital options on foreign currency (the '2000 Digital Options Strategy')." According to Plaintiffs' petition, BDO and Gramercy determined that, for the year 2000, there was not enough time to implement the agreed upon distressed debt strategy, so they instead implemented a Digital Options[4] Strategy with Plaintiffs' money for the 2000 tax year. Plaintiffs further alleged that, "unbeknownst to Plaintiffs, BDO and Gramercy dipped into the money Plaintiffs had deposited in a separate Gramercy account for investments wholly unrelated to the tax-reducing strategy and used $750,000 to execute the digital options necessary to implement the 2000 Digital Options Strategy."

Plaintiffs allege that Digital Option Strategies were developed and marketed from 1991 to 1999 by a partner at Jenkens & Gilchrist. *See The Diversified Grp., Inc. v. Daugerdas & Jenkens & Gilchrist*, 139 F. Supp. 2d 445 (S.D.N.Y. 2001). To implement the strategy, Plaintiffs formed a single member LLC to purchase and sell digital options on foreign currency. Some of the options Plaintiffs purchased through their LLCs allowed Plaintiffs to enter into one of two "forward foreign

---

[4] Digital options provide an investor the opportunity to gain or lose a pre-determined amount in full if a strike price is met.

currency contracts whereby Plaintiffs pay out or received a predetermined amount in foreign currency."[5]  Each option involving forward foreign currency contracts was offset by another option, providing foreign currency contracts with identical, but otherwise opposite, payouts.  In other words, the options were issued in offsetting pairs with different, but narrow, strike prices.

Then Plaintiffs Lowry, Chabaud, and Moffit, through their respective LLCs, contributed their options to another newly formed LLC ("Fund LLC").  On the options expiration date, the digital options expired, creating a gain or loss.  With regard to the options involving forward foreign currency contracts, Plaintiffs then exercised their rights or obligations on the underlying foreign currency contracts, resulting in a gain or loss (depending on the foreign currency exchange rate).

Next, Plaintiffs made a capital contribution of cash or capital assets to the Fund LLC.  The defendant law firms opined that the Fund LLC would be treated as a partnership for tax purposes.   Then Plaintiffs then contributed their partnership Fund LLC interest to an S Corporation.

Finally, the S Corporations sold the capital or ordinary assets contributed by the Individual Plaintiffs.  Because the assets had an artificially inflated basis, their sale lead to substantial losses that Plaintiffs were told to use to offset gains or income on their tax return.

---

[5]  A foreign currency forward contract obligates its parties to exchange currency at a prespecified exchange rate on a future date.

According to Plaintiffs, they were not told that their 2000 Digital Options Strategy was required to be disclosed on their tax returns. Defendants also failed to register the 2000 Digital Options Strategy as a tax shelter with the IRS. The Plaintiffs that participated in the 2000 Digital Option Strategy allege that they would have refused to participate had they been fully and properly informed. Sidley Austin provided the promised opinion letter that the positions were legal and that Plaintiffs would not be subject to any IRS penalties related to their tax positions.

Plaintiffs further allege that the Strategy Defendants acted in their own interest rather than Plaintiffs' interest when they told Plaintiffs not to participate in a 2001 IRS amnesty program aimed at these types of transactions. Plaintiffs allege a conflict of interest, as the amnesty program required taxpayers to disclose the names of all of the individuals and entities involved in the marketing, sale, or implementation of the tax position, or who received a fee.

### d. 2001 Distressed Debt Strategy

In 2001, Plaintiffs Lowry, Falling Creek LLC, Chabaud, Rac Wimbledon, LLC, Moffitt, J. Jason, LLC, Chabaud (as Trustee of the Russell G. Chabaud 1999 Investment Trust, the Ashley Chabaud 1999 Investment Trust, and the Audrey Chabaud 1999 Investment Trust), R-Russell Wimbledon LLC, R-Ashley

15

Wimbledon LLC, R. Audrey Wibledon, LLC, and LMC Recovery Fund LLC entered into the 2001 Distressed Debt Strategy.

To implement, in April 2001 and July 2001 Plaintiffs made capital contributions to LMC Recovery Fund. Brazilian and Bulgarian companies then contributed certain distressed debt assets[6] to the Gramercy Local Markets Recovery Fund, LLC, which, in turn, contributed the distressed debt instruments to LMC in exchange for a membership interest therein. The plaintiffs purchased additional interest in LMC from the Brazilian and Bulgarian interest-holders. Finally, LMC sold a portion of the distressed debt instruments, generating losses.

Sidley Austin's opinion letters again advised that these transactions were legal and that LMC Recovery Fund LLC would be treated as a partnership for tax purposes. Plaintiffs and other contributors to LMC (Gramercy Local Markets Recovery Fund and the Brazilian and Bulgarian companies) would be considered the partners. BDO Seidman prepared the 2001 federal return for LMC and provided a copy of the return to Plaintiffs. In reliance on the 2001 Strategy Defendants' advice, plaintiffs included—on their individual 2001 tax returns—the losses purportedly generated from the 2001 distressed debt strategy.

---

[6] Distressed debt instruments are those that can be purchased at a significant discount from the face value, such that they have a significant built-in loss through their high basis but low value.

With regard to this transaction, Plaintiffs assert that BDO Seidman, Gramercy, and Sidley Austin committed fraud in inducing them to participate in the distressed debt transactions. They assert that each of these defendants made "various false statements of material fact and omitted to state material facts that made the statements misleading to Plaintiffs." The purpose, Plaintiffs allege, was "to generate fees by promoting an alleged tax-saving strategy." Plaintiffs would not, they claim, have participated in the 2001 Distressed Debt Strategy had these defendants not deceived the Plaintiffs.

### e. 2002 - 2008 Distressed Debt Strategy

Aside from a change in the law firm providing the opinion letters and a different firm preparing some of the entities' tax returns, the 2002–2008 Distressed Debt Strategies were identical in structure—and basically continuations—of the 2001 Distressed Debt Strategy.

## C. The Trial Court Proceedings

Following extensive briefing, the trial court denied the Gramercy Defendants' special appearance at an October 17, 2013 hearing. The Gramercy defendants timely filed this accelerated appeal.

### ISSUE ON APPEAL

In a single issue, the Gramercy defendants challenge the trial court's order denying their special appearance:

Did the district court err in denying Gramercy's Amended Special Appearance and exercising personal jurisdiction over Gramercy when Appellees conceded Gramercy was not subject to general jurisdiction, and when there was virtually no connection between Gramercy's Texas contacts and the misconduct forming the basis of Appellees' claims?

## THE GRAMERCY DEFENDANTS' SPECIAL APPEARANCE AND THE PLAINTIFFS' RESPONSE

In their special appearance, the Gramercy defendants contended that the trial court's exercise of specific personal jurisdiction over them was improper, as they lacked sufficient minimum contacts with Texas. Specifically, they argued that it was BDO, and not the Gramercy defendants, who advised Plaintiffs to engage in a risky tax-reduction investment strategy. And they cited their written contracts with Plaintiffs acknowledging that Plaintiffs were not relying upon the Gramercy defendants for tax advice.

Because the agreement between Gramercy and Plaintiffs specified that Gramercy did not offer Plaintiffs tax opinions or advice, and because Plaintiffs' allegation is that they received faulty tax advice, the Gramercy defendants argue that they have "no place in this lawsuit."

As evidence, Gramercy proffered two affidavits, summarized here:

> ***Robert Lanava's affidavit***: Lonava is the Managing Director for Operations for all the Gramercy defendants. Lonava stated that none of the Gramercy defendants are organized in Texas; each has its principal place of business in either Connecticut or New York. Gramercy's business and financial operations are focused in Connecticut, New York, and overseas. Gramercy has not had offices or employees operating in Texas.

18

Gramercy did not affirmatively solicit Plaintiffs' investments. Rather, Plaintiffs were referred to Gramercy by BDO. The investment services rendered by Gramercy for Plaintiffs were performed entirely outside of Texas.

Gramercy has not had an agency relationship with any co-defendant, and has not "had any contract or other type of agreement with them."

To the best of Lanava's knowledge, Plaintiffs' representatives visited New York to meet with Gramercy to discuss the proposed investments. Periodic written communications to Plaintiffs were limited to account statements and notifications and contracts and other documents that were sent to Plaintiffs for their signature. Gramercy exchanged emails and facsimile communications with Plaintiffs incident to the administration of Plaintiffs' investments.

The distressed debt and emerging market debt acquired by Plaintiffs was located in Brazil and the Russian Federation. The currency options Gramercy procured for Plaintiffs were through firms located in New York City.

Gramercy did not prepare, review, or file tax returns for Plaintiffs.

A Tennessee district court has dismissed a suit against Gramercy Advisors for lack of personal jurisdiction.

*Jay Johnston's affidavit*: Defendant Johnston is Co-Managing Member of defendant Gramercy Advisors. Johnston lives in Puerto Rico and previously resided in Conneticut. He has never lived in Texas; nor has he had offices or property in Texas.

Johnston did not affirmatively solicit Plaintiffs. Plaintiffs were referred to Gramercy by BDO.

We regard to his interaction with Plaintiffs, Johnston's affidavit further averred:

> Plaintiffs invested in distressed Brazilian and certain Russian assets through Gramercy, and also separately invested in Gramercy's emerging market hedge funds. To the best of my recollection, I may have attended a single meeting in Texas in late 2000 with Plaintiffs' representatives and representatives of BDO Seidman, LLP prior to Plaintiffs 'investments with

19

Gramercy (I am not certain of the timing). To the best of my recollection, my participation was limited to a discussion of Gramercy's hedge fund operations; a description of emerging market distressed debt assets to be acquired by Plaintiffs, and a general description of other financial and transactional aspects of the services that would be performed by Gramercy on Plaintiffs' behalf. I did not address the tax implications of any transactions conducted for Plaintiffs, the anticipated IRS position with respect thereto, which I understand to be the subject of this action.

Following Plaintiffs' investments with Gramercy, I met with Plaintiffs in Texas on a few additional occasions at Plaintiffs' request. However, the purpose of these meetings was solely to update Plaintiffs with respect to their investments in Gramercy's hedge funds. These investments were unrelated to the transactions subsequently challenged by the IRS which, as I understand it, form the basis of the instant lawsuit.

Plaintiffs filed objections and a motion to strike the Lanava and Johnston affidavits "because they are replete with legal conclusions, averments make purely 'upon information and belief,' and matters outside the affiants' personal knowledge, as well as generally lacking in credibility." No ruling on these objections or motion appears in the record.

In their response to the Gramercy defendants' special appearance, Plaintiffs disputed that the Gramercy defendants were only investment advisors that lacked sufficient minimum contacts in Texas. Specifically, they argued:

Gramercy made numerous purposeful contacts with the state of Texas directly relating to the actions complained of by Plaintiffs in this case. Gramercy willfully participated in a scheme to defraud Plaintiffs, all of whom are Texas residents. Gramercy met face-to-face with Plaintiffs in Texas on numerous occasions to market, sell, and

implement the tax-reducing investment strategies at issue in this case. Gramercy's role was much broader than merely executing investments strategies determined by others. Instead, Gramercy was actually involved from the beginning in every aspect of the tax-reducing investment strategies, including discussing the alleged tax benefits with Plaintiffs as part of the initial sales pitch in Texas. Contrary to Gramercy's position, Gramercy did, in fact, discuss the tax-advantaged nature of the strategies at Texas meetings and pitched the tax savings as one of the reasons for doing the deals. Those meetings alone subject Gramercy to jurisdiction in Texas. Gramercy also purposefully directed its activities at Texas by:

- Drafting, negotiating, and entering into numerous contracts with Texas-resident Plaintiffs related to the tax-reducing investment strategies, which contracts contemplated a longterm relationship between the parties with performance occurring at least in part in Texas;

- Managing and holding partnership interests in several entities-some of which resided in Texas-that were involved in the tax-reducing investment strategies and selling partnership interests and distressed debt assets to Texas-resident Plaintiffs;

- Directing and overseeing the preparation of tax returns and Schedule K -1 s containing the tax losses generated by the tax-reducing investment strategies for the benefit of Texas resident Plaintiffs and mailing and, in one instance, hand-delivering the returns and K -1s to Plaintiffs in Texas;

- Earning millions of dollars from its purposeful actions in Texas through fees generated by investment management agreements with Plaintiffs and undisclosed kick-backs from consulting fees paid by Plaintiffs to BDO;

- Sending regular, monthly account statements to Plaintiffs in Texas, setting up a secure website for Plaintiffs to view account information from Texas, and inviting Plaintiffs to participate in quarterly conference calls from Texas; and

- Marketing and selling tax-reducing investment strategies-similar to the ones sold to Plaintiffs-to other Texas clients.

As evidence in support, the Plaintiffs proffered affidavits by Plaintiffs Chabaud, Deary, Lowry, and Moffitt, as well as affidavits by Plaintiffs' accountant and lawyer. In these affidavits, Plaintiffs averred that, at the September 26, 2000 meeting with BDO, BDO representatives pitched the distressed-debt strategy and recommended that Plaintiffs engage Gramercy to assist BDO. Plaintiffs did not initiate the follow-up November 7, 2000 meeting with BDO and Gramercy's principal, Jay Johnston. At that meeting, Johnston introduced himself as a principal with Gramercy, and "Johnston and Shanbrom [with BDO] worked together equally on the 'pitch' that was made to [Plaintiffs] during the meeting." Both Shanbrom and Johnston touted R.J. Ruble, a partner with Sidley Austin, as the recognized expert on distressed debt strategies. Shanbrom explained that an opinion letter from Ruble would shield Plaintiffs from liability with the IRS. "Johnston reiterated that Ruble was an expert in this area, Sidley Austin was a qualified and reputable law firm, and Gramercy had experienced good results from Sidley Austin on these types of transactions in the past."

Plaintiffs' affidavits further provided that Shanbrom represented, and Johnston confirmed, that investing with Gramercy in areas other than distressed debt would offer diversity and improve Plaintiffs' position with the IRS. Both "Johnston and Shanbrom assured [Plaintiffs] that the Investment Strategies were legal."

Plaintiffs also averred that Johnston and Shanbrom again met with Plaintiffs and their accountant in Houston on January 11, 2001, to discuss the digital options strategy and other investments with Gramercy. Plaintiffs averred that they again met with Johnston and BDO representatives on May 8, 2001 in Houston. According to Plaintiffs, during that meeting, which was requested by Gramercy, they "discussed the opinion letters drafted by Sidley Austin concerning the legality of the Investment Strategies and had a broad discussion about [each individual Plaintiffs'] tax loss needs for 2001." Plaintiffs' affidavits highlight several other meetings with Gramercy principals to discuss tax matters and investments.

## STANDARD OF REVIEW

Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 790–91 (Tex. 2005); *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Because the trial court's exercise of personal jurisdiction over a nonresident defendant is one of law, an appellate court reviews the trial court's determination of a special appearance de novo. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007); *BMC Software*, 83 S.W.3d at 794. However, the trial court must frequently resolve fact questions before deciding the jurisdictional question. *BMC Software*, 83 S.W.3d at 794; *Capital Tech. Info. Servs., Inc. v. Arias & Arias, Consultores*, 270 S.W.3d 741, 748

(Tex. App.—Dallas 2008, pet. denied) (en banc). In a special appearance, the trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Ashdon, Inc. v. Gary Brown & Assocs.*, 260 S.W.3d 101, 116 (Tex. App.—Houston [1st Dist.] 2008, no pet.).

We do not "disturb a trial court's resolution of conflicting evidence that turns on the credibility or weight of the evidence." *Ennis v. Loiseau*, 164 S.W.3d 698, 706 (Tex. App.—Austin 2005, no pet.). When a trial court does not issue findings of fact or conclusions of law, "all facts necessary to support the judgment and supported by the evidence are implied." *BMC Software*, 83 S.W.3d at 795. We will affirm the trial court's ruling on any legal theory that finds support in the record. *Dukatt v. Dukatt*, 355 S.W.3d 231, 237 (Tex. App.—Dallas 2011, pet. denied).

## PERSONAL JURISDICTION

The Texas long-arm statute permits Texas courts to exercise jurisdiction over nonresident defendants. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 17.041–.045 (West 2014); *PHC—Minden, L.P. v. Kimberly—Clark Corp.*, 235 S.W.3d 163, 166 (Tex. 2007); *BMC Software*, 83 S.W.3d at 795. It extends Texas courts' personal jurisdiction "as far as the federal constitutional requirements of due process will permit." *PHC–Minden*, 235 S.W.3d at 166 (quoting *U–Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)).

24

The Due Process Clause of the Fourteenth Amendment operates to limit the power of a state to assert personal jurisdiction over a nonresident defendant. *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano Cnty.*, 480 U.S. 102, 108, 107 S. Ct. 1026, 1030 (1987); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–14, 104 S. Ct. 1868, 1872 (1984). Under the Due Process Clause, personal jurisdiction over a nonresident defendant is constitutional when the nonresident defendant has established minimum contacts with the forum state and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S. Ct. 2174, 2184 (1985); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945). Minimum contacts are sufficient to support the exercise of personal jurisdiction if they show that the nonresident defendant has "purposefully availed" itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *See Int'l Shoe Co.*, 326 U.S. at 319, 66 S. Ct. at 160; *Michiana*, 168 S.W.3d at 784.

The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the Texas long-arm statute. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010); *Moki Mac*, 221 S.W.3d at 574. The nonresident defendant then has the burden of negating all bases of jurisdiction alleged in the plaintiff's petition. *Kelly*, 301 S.W.3d at 657–

58; *Moki Mac*, 221 S.W.3d at 574. The defendant can introduce evidence disproving the plaintiff's factual allegations, or show that the defendant's contacts with the forum state "fall short of purposeful availment," or demonstrate that "traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction." *Washington DC Party Shuttle, LLC v. IGuide Tours*, 406 S.W.3d 723, 728 (Tex. App.–Houston [14th Dist.] 2013, pet. denied) (en banc). If specific jurisdiction is at issue, then the defendant also can show that the plaintiff's claims do not arise from the defendant's contacts with Texas. *Id*.

## ANALYSIS

State statutory and federal due-process requirements are satisfied if (a) a nonresident has minimum contacts with Texas, and (b) exercise of personal jurisdiction over the nonresident does not offend traditional notions of fair play and substantial justice. *Helicopteros Nacionales de Colombia, S.A.*, 466 U.S. at 414, 104 S. Ct. at 1872.

We first look to whether Plaintiffs have sufficiently pleaded a basis for the trial court to exercise specific jurisdiction over the Gramercy defendants. *Kelly v. General Interior Construction, Inc.*, 301 S.W.3d 653, 658–59 (Tex. 2010). Then we review the evidence proffered by the Gramercy defendants (as well as Plaintiffs' evidence in response), to determine if Gramercy negated all pleaded bases for jurisdiction. *Id*.

**A. Minimum Contacts**

Minimum contacts suffice for personal jurisdiction when the nonresident purposefully avails itself of the privilege of conducting activities within the forum state, and thus invokes the benefits and protections of its laws. *Moki Mac*, 221 S.W.3d at 575. The crux of the Gramercy defendants' argument is that Plaintiffs' claims relate to tax advice, Plaintiffs disclaimed reliance on Gramercy's tax advice, and, therefore, any contact Gramercy had with Texas cannot be sufficiently related to Plaintiffs' claims to confer personal jurisdiction over Gramercy. We disagree.

Preliminarily, we note that the Gramercy defendants' arguments conflate liability with jurisdiction. The Texas Supreme Court has expressly rejected an approach "equating the jurisdictional inquiry with the underlying merits," noting that would allow a nonresident defendant to "defeat jurisdiction by proving that there was no tort." *Michiana Easy Livin' Country Inc. v. Holten*, 168 S.W.3d 777, 789 (Tex. 2005). Accordingly, to the extent that the Gramercy defendants argue that the contractual disclaimers of reliance signed by Plaintiffs negate jurisdiction because they purport to limit or reduce the Gramercy defendants' liability related to tax advice, we reject that argument. *See, e.g., Citrin Holdings, LLC v. Minnis*, 305 S.W.3d 269, 283 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

We also conclude that the Gramercy defendants' interpretation of the Plaintiffs' claims, and the alleged contacts that are related to those claims, is too

narrow.  We analyze these contacts to determine if the Gramercy "purposefully availed itself of the privilege of conducting activities in Texas" considering three factors articulated by the supreme court:

> First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. Thus, sellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the jurisdiction of the latter in suits based on their activities. Finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction.

*Moncrief Oil Int'l v. OAO Gazprom*, 414 S.W.3d 142, 151 (Tex. 2013).

Applying this standard to the contacts with Financial Strategy Group—a nonresident company hired by Gramercy to prepare tax returns for a nonresident Fund used in implementing the Investment Strategies—we concluded that its contacts were too attenuated to give rise to jurisdiction in Texas.  *Fin. Strategy Grp.*, 2015 WL 452265, at *11.   The Gramercy connections alleged here by Plaintiffs, however, are much greater and more purposeful than Financial Strategy Group's alleged contacts.

Jurisdiction is proper "where the contacts proximately result from actions by the defendant *himself* that create a substantial connection with the forum State." *Id*. (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, 475, 105 S. Ct. 2174 (1985) (quotation marks omitted)). A substantial connection can result from even a single act.  *Id*. (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223, 78 S.

28

Ct. 199, 222 (1957)). But the unilateral activity of another person cannot create jurisdiction. *Id*. (citing *Burger King*, 471 U.S. at 475, 105 S. Ct. at 2174). Physical presence in the state is not required but "frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there." *Id*. (quoting *Burger King*, 471 U.S. at 476, 105 S. Ct. 2174). At its core, the purposeful availment analysis seeks to determine whether a nonresident's conduct and connection to a forum are such that it could reasonably anticipate being haled into court there." *Id*. (quoting *Burger King*, 471 U.S. at 474, 105 S. Ct. 2174).

"It is beyond dispute that [a forum] has a significant interest in redressing injuries that actually occur within the State." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776, 104 S. Ct. 1473, 1479 (1984). Accordingly, states have a strong interest "in exercising judicial jurisdiction over those who commit torts within its territory." *Id*. "This is because torts involve wrongful conduct which a state seeks to deter, and against which it attempts to afford protection, by providing that a tortfeasor shall be liable for damages which are the proximate result of his tort." *Id*.

The Gramercy defendants cite several cases applying these standards to hold that the courts lacked personal jurisdiction in a variety of contexts, despite the nonresident defendants' attending meetings in the forum at issue. *See, e.g.*,

*Gustafson v. Provider Healthnet Servs., Inc.*, 118 S.W.3d 479, 484 (Tex. App.—Dallas 2003, no pet.) (defendant's attendance at two Texas meetings did not give rise to specific jurisdiction, in part because plaintiff did not allege defendant "breached any duties to it or committed any torts during these meetings"); *Marathon Oil Co. v. A.G. Ruhrgas*, 182 F.3d 291, 295 (5th Cir. 1999) ("Its mere presence at the three meetings in Houston, together with the noted correspondence and phone calls, is not sufficient to establish the requisite minimum contacts because the record is devoid of evidence that Ruhrgas made false statements at the meetings or that the alleged tortious conduct was aimed at activities in Texas"); *Turan v. Universal Plan Inv. Ltd.*, 10 F. Supp. 2d 671, 674 (E.D. La. 1999), *aff'd in part* 248 F.3d 1139 (5th Cir. 2001) ("Travels to business meetings, conversations on the telephone, and correspondences by mail are not sufficient to establish minimum contacts unless there is evidence that the plaintiffs' claims directly arise from those specific activities."); *Bozell Grp., Inc. v. Carpet Co-op of Am. Ass'n, Inc.*, No. 00 CIV. 1248(RWS), 2000 WL 1523282 (S.D.N.Y. 2000) (holding that two trips to forum and phone calls were insufficient to confer jurisdiction over nonresident defendant under New York's long-arm statute because these contacts fell short of "conducting business" in New York, and because there lacked a sufficient nexus between the contacts and the plaintiff's claim).

In contrast, Plaintiffs cite numerous cases for the proposition that "[c]ourts uniformly exercise specific jurisdiction where a nonresident defendant attended meetings in Texas concerning the facts of the lawsuit." *See, e.g.*, *Moncrief*, 414 S.W.3d at 153–54 ("Because the Gazprom Defendants attended two Texas meetings, at which they accepted Moncrief's alleged trade secrets regarding a proposed joint venture in Texas, their contacts were not unilaterally from Moncrief, nor were they random and fortuitous."); *Max Protetch, Inc. v. Herrin*, 340 S.W.3d 878, 887–88 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (holding that personal jurisdiction over New York company was supported in part by misrepresentations made by New York defendant while at Texas meeting); *Horizon Shipbuilding, Inc. v. Blyn II Holding, LLC*, 324 S.W.3d 840, 849 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (rejecting argument that nonresident defendant attending two Texas meetings and participating in phone calls were too "isolated, incidental and attenuated" to constitute purposeful availment); *Citron Holdings, LLC*, 305 S.W.3d at 283 (affirming trial court's denial of special appearance, in part because "the circumstances involve multiple Texas contacts over many months in the course of an ongoing relationship that 'was not unilaterally initiated by the Texas resident'").

Plaintiffs' claims here are more like the cases cited by Plaintiffs than by the Gramercy defendants. Plaintiffs allege that Gramercy and each of the other

defendants represented that they were independent and working in the interest of Plaintiffs. Plaintiffs further contend that Plaintiffs were fraudulently induced to enter into various aspects of the several years' long Investment Strategy based upon representations by both BDO and Gramercy. Plaintiffs allege that Gramercy's representative Johnston praised Sidley Austin (and, later, DeWest Castro) as reputable law firms with expertise in this area, and steered Plaintiffs to them for "independent" opinion letters confirming the validity of the distressed debt strategy when, in reality, Gramercy and the other defendants knew the law firms were merely churning out fill-in-the-blank opinion letters. Finally, Plaintiffs allege that Gramercy hid from Plaintiffs its agreement with BDO requiring BDO to pay a portion of the consulting fees BDO received from Plaintiffs to Gramercy.

According to Plaintiffs' theory, Johnston (as a representative of Gramercy) attended a meeting in Texas at which Gramercy specifically targeted Plaintiffs for longterm business while (1) misrepresenting its role in the development of the Investment Scheme, (2) knowing that information was being fed to Plaintiffs that was untrue, and (3) seeking to profit from Plaintiffs' investments tied to the Investment Strategies, as well as other investments and the secret payments from BDO.[7]

---

[7] The Gramercy defendants point to the fact that the parties' investment agreements have a New York choice-of-law provision, but such a provision is not dispositive on the issue of purposeful availment and minimum contacts in light of these

These alleged contacts, which are substantially connected to Plaintiffs' claims, amount to purposeful availment for purposes of establishing minimum contacts. While the Gramercy defendants' affidavits dispute some of Plaintiffs' allegations and focus on representations made by BDO to Plaintiffs, we must presume at this state that "the trial court resolved all factual disputes in favor of its judgment." *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002). Because the Gramercy Defendants' evidence does not conclusively negate all bases of jurisdiction pleaded by Plaintiffs, e.*g.*, *Parex Res., Inc. v. ERG Res., LLC*, 427 S.W.3d 407, 415–16 (Tex. App.—Houston [14th Dist.] 2014, pet. filed), the Gramercy Defendants have not carried their burden to establish that the trial court erred in finding sufficient minimum contacts.

## B. Traditional Notions of Fair Play and Substantial Justice

To affirm the trial court's denial of the Gramercy defendants' special appearance, we must also determine that the court's exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice. To answer this question, courts generally look to (1) the burden on the defendant; (2) the interests in the forum state in adjudicating the dispute; (3) the plaintiff's interests in obtaining convenient and effective relief; (4) the interstate judicial

---

allegations. *See Citrin Holdings, LLC*, 305 S.W.3d at 283 ("[T]he presence of a New York choice of law provision in the Cargo Ventures Operating Agreement is not dispositive and is outweighed by the other Texas-centered contacts.").

system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the states in furthering fundamental substantive social policies. *Burger King*, 471 U.S. at 476–77, 105 S. Ct. 2174. The defendant bears the burden of establishing that the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice. *Conner v. ContiCarriers & Terminals, Inc.*, 944 S.W.2d at 405, 411 (Tex. App.—Houston [14th Dist.] 1997, no pet.).

Considering the above-listed factors, we conclude that the exercise of personal jurisdiction in this case is consistent with traditional notions of fair play and substantial justice. The Gramercy defendants contend that defending this suit in Texas would be a considerable burden because (1) Gramercy does not have a business presence in Texas, (2) its files are not in Texas, and (3) a New York choice-of-law provision governs at least part of the dispute. In support, it cites two unpublished orders in cases from Illinois finding that jurisdiction over the Gramercy defendants in that state would offend traditional notions of fair play and substantial justice.[8] The trial court in both concluded that the Illinois courts lacked jurisdiction over Gramercy because "Plaintiffs and Gramercy Defendants reside outside of Illinois and none of the alleged transactions in which the Gramercy

---

[8] These orders were issued on November 26, 2014 by the Circuit Court of Cook County, Illinois in *Coe v. BDO Seidman*, Cause No. 12 L 13691 and *Kaufman v. BDO Seidman*, Cause No. 12 L 13292.

34

Defendants were involved, concerning Plaintiffs, took place in Illinois," and the "contract [was] neither negotiated nor performed in" Illinois. Given that here we have concluded that Gramercy has sufficient minimum contacts with Texas that exceed its connection to Illinois discussed in those cases, we find the Illinois cases relied upon by Gramercy to be inapposite.

The Gramercy defendants have not established that this is one of those "rare cases" in which the exercise of personal jurisdiction offend traditional notions of fair play and substantial justice, *Retamco Operating, Inc. v. Republic Drilling Co*, 278 S.W.3d 333, 341–42 (Tex. 2009).

## CONCLUSION

We affirm the trial court's order denying the Gramercy defendants' special appearance.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Higley and Massengale.